UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES

v.                                             INDICTMENT NO. 05-10181-NG

IRINA VLASOVA

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUPPRESSION OF EVIDENCE

The Defendant Irina Vlasova ("Ms. Vlasova"), in the above-numbered Indictment
and through Counsel, submits the following Memorandum in Support of her Motion for
Suppression of Evidence.

Facts.

At indeterminate times prior to May, 2005, members of the Massachusetts State
Police and others upon information and belief, including federal authorities, conducted an
investigation into certain allegations of internet fraud.

This probe first focussed on Ms. Vlasova as a "witness/subject," upon information
and belief. Ultimately she became a "target," and a six-count Indictment against her and
one Vahagn Gilavyan ("Gilavyan") ensued.[1]

The foundation of the Government's evidence against Ms. Vlasova involves claims
that her "boyfriend" -- Victor -- was in the business of ordering goods over the wire,
paying for them with stolen credit cards, and in turn placing the property with Ms.
Vlasova.

Significant and perhaps mortal evidence against Ms. Vlasova was derived from an
interrogation. Contained in the sparse discovery made available to Ms. Vlasova thus far is

---

[1]   Conspiracy; mail fraud; fraudulent access devices; "device making equipment;"
aggravated identity theft; and aiding and abetting.

a transcript of that interrogation. It reveals data deriving from three sources, one the parent to the others.

First, there was a statement made by Ms. Vlasova. Then there was a warrantless search of her living quarters upon her "consent," also reflected in the transcript. Finally, having seized certain computer equipment from Ms. Vlasova's residence, the investigating officers obtained a warrant from the Brookline, Massachusetts District Court to conduct an examination of the seized apparati.

On May 3, 2005, but prior to the interrogation of Ms. Vlasova, certain law enforcement officers[2] received information from "UBid" that two Sony computers, having been purchased with an alleged fraudulent credit card, were to be delivered to 164 Strathmore Road #9 in Brighton, Massachusetts.[3]  A "controlled delivery" of the parcels was made to the address by a Secret Service Agent. The attendant investigators observed Ms. Vlasova's car in the vicinity and, evidently saw her, along with a companion -- Gilavyan -- retrieve the packages and drive away. It is not clear that any of the Officers witnessed the placement of the parcels into the vehicle.

In any event, the car was stopped and searched, the search yielded the packages. Both Ms. Vlasova and Gilavyan were arrested on the spot on suspicion of receiving stolen property.

Shortly thereafter, while still under Police custody, Ms. Vlasova was subjected to an official interrogation.[4]  There were several law enforcement officers present.[5]

---

[2]  Representatives from the Massachusetts State Police, the United States Postal Inspectors and the United States Secret Service.

[3]  This was not Ms. Vlasova's address.

[4]  A transcript of this proceeding has been annexed hereto as Exhibit "1."

[5]  These were [Federal] Special Agent Dean Tramonta, Massachusetts State Police Trooper Richard Huber, Paul Duran, Paul Chisolm, Ed Amendola, and Tom O'Leary. The employ of the latter four is currently unknown to Ms. Vlasova or her Counsel. The name

2

According to an the Interrogator, they were "...looking to prosecute [her] federally." An "unidentified male" added that money laundering charges were under consideration.[6] Further upon the Interrogator's claim, "everything" [meaning the stolen property and its shipping, presumably] was in Ms. Vlasova's name. "Victor [Ms. Vlasova's 'boyfriend' has taken very good care of himself, to make sure the finger points to you."[7]

Taken as a whole, the culpably matter cited in the transcript came in through leading – testimonial -- statements and questions on the part of the Interrogator. The portion of the document occupied by Ms. Vlasova's words was small by comparison. Ms. Vlasova, a naturalized American Citizen, is Russian born, raised and educated on foreign soil, under a set of mores and societal strictures different from those in this country. Although she possesses a passable use of the English language, it is far from sophisticated. Nuance and conceptually difficult ideas expressed to her in English mostly evade her. The text of Exhibit 1 clearly evidences her hardship of commerce with the English tongue.[8]

Nor did Ms. Vlasova evince in her words even a fundamental concept of wrongdoing as defined by the laws of the United States. Likewise, that she had specific rights and choices perforce such abstractions as "waiver" and "consent" was virtually lost on her.

---

of the official who conducted the questioning is also unknown and so is referred to, simply, as "the Interrogator."

[6]  Exhibit 1, page 6.

[7]  Exhibit 1, page 8.

[8]  For example, at page two of Exhibit 1, Ms. Vlasova states that she did not know "why she was here today."

That she may arguably have incriminated herself, and "consented" to a search in the course of the interrogation does not mean that these were lawful products of the inquiry.

But in her own instinctive, albeit inarticulate fashion, she raised the issue of counsel several times.

At page three of the transcript, Ms. Vlasova raises the issue of Counsel – it was clearly on her mind. The Interrogator, however, rather than cease the questioning or at least explaining her right to Counsel and inviting her to investigate it, simply resumes the interrogation.

At page seven of the transcript, the Interrogator told in passing that she had a right to Counsel, but immediately on the heels of these words another [unidentified] officer told her unequivocally that "This is your only opportunity right here [to give information and receive 'leniency']." Ms. Vlasova asked him "What's 'leniency?' "

Once again at page eleven of the transcript, Ms. Vlasova specifically speaks a desire to "talk to my lawyers." And, one again, rather than honor the request, the Interrogator simply tells her that this is a one-time deal, adding that from that day forward, the charges would become more expansive, and the jurisdiction of the Federal Court invoked. The Interrogator is clear on the inevitable momentum of Ms. Vlasova through the criminal system.

Once more, at page fourteen of the transcript, Ms. Vlasova said "I would like to talk to [an Attorney], yes."[9] The follow-up by the Interrogator at this point was a classic "bait and switch routine." He said, "Okay. We're going to end the conversation now." Of course, the conversation did not end and, without letting a elapse, the Interrogator said "We will ask you one further question, to ask if we could have consent to search your

---

9  Just prior to the invocation of a right, the tape was suspended, leaving no evidence of what occurred in the hiatus before the tape was resumed. It might have been Ms. Vlasova's claim of right, since when the tape resumed such was the topic of conversation.

4

apartment." The search request was still part of the interrogation, inasmuch as it sought the voluntary relinquishment of a constitutional right -- to refuse -- which she did not even know she possessed. The Interrogator told Ms. Vlasova that he would get a warrant to search her residence[10] in any event, so that in Ms. Vlasova's mind a search was to be inevitable and she had no right to resist it. Had she had the benefit of Counsel at that point, she would have been advised differently. Had the Officers present offered a warrant application to a neutral Magistrate, he or she may well have denied it for lack of probable cause.

In the ensuing "discussion" between the Interrogator and Ms. Vlasova concerning "consent" versus issuance of a warrant, the Interrogator may have been absolutely ingenious or, more likely "shooting fish in a barrel." That is, in such "discussion" -- and despite his acknowledgment of Ms. Vlasova's request for Counsel and the "cessation" of the interrogation,   the Interrogator still pressed the questioning, if under the not-even-disguised pretense that he was addressing the search issue. Hence, he elicited further culpable utterances from Ms. Vlasova.

At page twenty-two of the transcript, the tape is again suspended with no record as to the content in the gap. Once back on tape, however, Ms. Vlasova is characterized by the Interrogator as having had a change of heart:

Q. "[Y]ou wish to speak with us now?"

A. "Yeah."

The balance of the interrogation demonstrates that Ms. Vlasova was just as confused as she was to begin with.

This interrogation, conducted of Ms. Vlasova in the presence of six law enforcement officers, may be clearly characterized as a "we-won't-take-no-for-an-answer" sort of proceeding, in which Ms. Vlasova's concerns about consulting with Counsel were

---

10   And any electronic equipment within the residence.

5

given a nod and ignored. As to the questions concerning "consent," these were a clever extension of the interrogation, without any instruction on Fourth Amendment rights. The search itself was foregone conclusion.

On the same day, pursuant to Ms. Vlasova's "consent," the Officers conducted a warrantless search of her residence and seized a variety of objects and documents, including three computers.[11]

On May 9, 2005, Massachusetts State Police Trooper Richard P. Huber ("Trooper Huber") obtained a search warrant from the Brookline District Court for the examination – by Federal Agents -- of the information contained in the three computers seized from Ms. Vlasova's dwelling. Oddly enough, Trooper Huber asked leave to inspect one of the seized computers.[12] Ms. Vlasova's Counsel has not been provided with a copy of the warrant return, which ought to describe any data extracted from the devices.

Argument.

1. Ms. Vlasova's Right to Counsel was not Honored.

Where an accused is subjected to a Police interrogation and raises the question of Counsel, at any time during the course of the questioning, the interrogation must abruptly cease.

United States v. Edwards, 451 U.S. 477, 101 S.Ct. 1880 (1983).

The defendant in Edwards was arrested on a murder charge, taken to the station house, informed of his Miranda rights and interrogated. He agreed to be questioned, and made a taped statement containing an alibi defense. The defendant then wanted to make a "deal," but said that he wanted an attorney before making any agreement. The questioning ceased, but began again the following morning. Without counsel, the

---

[11]  The lists of materials taken in annexed hereto as Exhibit "2."

[12]  See paragraph 27 of Trooper Huber's warrant affidavit which, along with the warrant itself, is annexed hereto as Exhibit "3."

6

defendant made another statement, this time implicating himself in the crime. The Court found that under the circumstances the defendant's Fifth and Fourteenth Amendment safeguards had been violated, and reversed the conviction.

The Edwards Court conceded that a suspect, after he or she has been informed of the Miranda caveats, may validly waive those rights and respond to questioning.[13]  But

> ...the Court has strongly indicated that additional
> safeguards are necessary when the accused asks for
> counsel; and we now hold that when an accused has
> invoked his right to counsel present during custodial
> interrogation, a valid waiver of that right cannot be
> established by showing only that he responded to
> further police-initiated custodial interrogation even if
> he has ben advised of his rights.  We further hold that
> an accused, such as Edwards, having expressed his
> desire to deal with the police only through counsel, is
> not subject to further interrogation by the authorities
> until counsel has been made available to him, unless
> the accused himself initiates further communication,
> exchanges, or conversations with the police.

At 451 U.S. 484-485.

The Edwards prophylaxis is "rigid," but requires the Courts to weigh an accused's words as to whether or not they amount to an invocation of the right to counsel. Davis v. United States, 512 U.S. 452, 458, 114 S.Ct.2350 (1994), citing to Smith v, Illinois, 469 U.S. 91, 95, 105 S.Ct. 490 (1984). The Davis Court requires that the invocation of the right be "unambiguous," "requires, at a minimum, some statement that can reasonably construed to be an expression of a desire for the assistance of an attorney." Davis, at 512 U.S. 459, quoting McNeil v. Wisconsin, 501 U.S. 171, 178, 111 S.Ct. 2204 (1991).

---

13  At 451 U.S. 484, citing to North Carolina v. Butler, 441 U.S. 369, 372-376, 99 S.Ct. 1755 (1979).

Case 1:05-cr-10181-NG   Document 31   Filed 04/10/2006   Page 7 of 70

"unambiguous," then, depends upon the facts of a case, and may have many shades of meaning. It is in the judgement of the Trial Court to make the call. People, their communicative skills, and their understanding of constitutional guarantees are not uniform, and what may be ambiguous in one case may be unambiguous in a different set of circumstances. For example, in United States v. Goodridge, 945 F.Supp. 359, 367 (D. Mass. 1996),[14] the statement "maybe I should have an attorney" by a subject was a sufficient assertion of the right to counsel. There are as many interpretations of "unambiguous" as there are cases implicating the issue.

In any event, the law is clear that once the subject of a Police interrogation has uttered a desire for counsel – however inartful or inarticulate that may be – questioning must cease upon the spot.

Where a prosecutor may a waiver of rights by a subject after he or she has claimed the protection of a lawyer,

> The Court has stated "that we should 'indulge
> every reasonable presumption against waiver of
> fundamental constitutional right.' " Jackson, 475
> U.S. at 633, 106 S.Ct. 1404, quoting Johnson,
> 304 U.S. at 464, 58 S.Ct. 1019. "Doubts must be
> resolved in favor of protecting the constitutional
> claim." Jackson, 475 U.S. at 633, 106 S.Ct. 1404.
> "The determination of whether there has been an
> intelligent waiver of the right to counsel must depend,
> in each case, upon the particular facts and circumstances
> surrounding that case, including the background, experience
> and conduct of the accused." Johnson, 304 U.S. at 464,
> 58 S.Ct. 1019.

---

14   Post- Davis.

United States v. Leon-Delfis, 203 F.3d 103, 110 (1st Cir. 2000). The only way a waiver can come into play once a claim of counsel has been interposed is that, on his or her own initiative, a subject reactivates police/subject communications.

In the present case – at the very outset of the interrogation – Ms. Vlasova said "I'll probably need somebody to talk to." The Interrogator took this to mean a lawyer, and forged ahead with his inquiry. There were several other law enforcement people in the room. After a couple of minutes, the Interrogator insinuated that Ms. Vlasova's mother was involved in wrongdoing. Shortly thereafter, Ms. Vlasova said, I have to talk to my lawyers before." The Interrogator responded, "Okay. I'm not offering this chance again to help yourself." This statement appears for all the world to "marginalize" completely the importance of counsel and, once again, the Interrogator moves ahead with questions. Not too farther along, the Interrogator acknowledged Ms. Vlasova's right to counsel and said, "Okay. We're going to end the conversation now." But, of course, the conversation does not end at that point. The Interrogator then begins a dialogue with Ms. Vlasova about whether or not she will consent to an official search of her dwelling. The obvious goal of this line of questioning is to obtain the right to conduct a warrantless search for incriminating material. While this may have been a cagey maneuver on the part of the Interrogator, it was still designed to coax Ms. Vlasova to inculpate herself by effectively handing over the content of her home. It was most certainly not done with any deference to her acknowledged desire for counsel. But it was in the context of the official inquiry.

Ms. Vlasova really did not want her house to be searched. At page 21 of Exhibit 1 she said, "I don't know. I don't like people going into my house without me being in there, searching for stuff." The Interrogator told her they would get in, whether by consent or by warrant. She then said, "Are you sure you're going to get a search warrant?" The Interrogator says, simply, "yes."[15]

15 There was no evidence available to Counsel which would have supported a finding of probable cause sufficient to legitimate a warrant for the search of Ms. Vlasova's residence.

9

At page 14, ll 15-16 of the transcript, the Interrogator stopped the tape and suspended the interview. When the tape was resumed, Ms. Vlasova had undergone a sudden, and unexplained, change of heart. But it was the Interrogator, not Ms. Vlasova, who recited that she did so on her own initiative. There is no record of whatever exchange took place during the break in the tape. Very likely, the Interrogator "bullied" Ms. Vlasova into submission with his clever repartee concerning the search. She was falsely led to believe that her right to Counsel would avail her nothing.

This entire scenario is of that sort which <u>Edwards</u> and the cases cited herein would find to be constitutionally offensive. Therefore, for the reasons herein, and for any other reason this Court may find in the interests of justice, those statements made by Ms. Vlasova subsequent to her invocation of the right to Counsel, including her assent to the search. Must be excluded.

### 2. Ms. Vlasova's "Consent" to the Ensuing Search was not Valid.

Ms. Vlasova incorporates the argument in the previous section.

A recognized exception to the Warrant Clause is the consent of one whose privacy is at stake, but nonetheless agrees that a law enforcement officer may invade his or her premises. <u>Schneckloth</u> v. <u>Bustamonte</u>, 412 U.S. 218, 222, 93 S.Ct. 2401 (1973). In such a case, since it is the Government which will be claiming the exception, it is the Government's "...burden of proving that the consent was, in fact, freely and voluntarily given." <u>Bumper</u> v. <u>North Carolina</u>, 391 U.S. 543, 548, 88 S.Ct. 1788 (1968).

In <u>Bumper</u>, the searching Officer obtained "consent" by falsely claiming that he possessed a warrant permitting his intrusion. The <u>Bumper</u> Court ordered the fruits of the search excluded because the consent was not valid. The consent was not constitutionally[16] valid because it was not "freely and voluntarily given." Appropriately

---

[16]  Ms. Vlasova understands that the exceptions to the Warrant Clause are creations of the judiciary.

10

enough, the Bumper Court's decision relied upon the wisdom of this Court. At 391 U.S. 548-549, it cites to United States v. Elliott, 210 F.Supp. 357, 360 (D. Mass. 1962), which observed that

> [o]rderly submission to law-enforcement officers who, in effect, represented to the defendant that they had the authority...to search..., was not such consent as constituted an understanding, intentional and voluntary waiver by the defendant of his fundamental rights under the Fourth Amendment to the Constitution.

Id. "The district court's conclusion as to whether consent was freely given must take into account the totality of the circumstances surrounding the interaction between the defendant and the authorities." United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000). "This interaction, in turn, is measured by a standard of 'objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?'" United States v. Weidul, 227 F.Supp.2d 161, 166-167 (D. Mass.2002), quoting from United States v. Turner, 169 F.3d 84, 87 (1st Cir. 1999).

Moreover, a subject's "possible subjective state" is a factor in determining whether his or her apparent 'consent' was an intelligent and voluntary relinquishment of a right. See, for example, Schneckloth v. Bustamonte, 412 U.S.218, 227, 229, 247, 248, 93 S.Ct. 2041 (1973).

That a subject was simply "going along to get along" does not establish consent -- "...acquiescence not probative of consent." United States v. Berryman, 717 F.2d 651, 655 (1st Cir. 1983), citing to Bumper at 341 U.S. 548-549.

In United States v. Tibbs, 49 F.Supp.2d 47 (D. Mass. 1999), which also involved a search by alleged agreement in which the validity of the consent was challenged, the Court put something of a fine point on this exception to the Warrant Clause. The

11

accession to search in the Tibbs case was obtained by verbal coercion, but the Court was clear on the restrictions imposed by Bumper:

> When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. If that is false, whether or not the officers could have procured a warrant, consent procured as a result is vitiated.

At 49 F.Supp.2d 54, ft. 16, emphasis added. The Court went on to observe that although the officers did not claim to have actually had a warrant, they did represent that the ensuing intrusion was inescapable, one way or the other. The Court was of a mind that this was not so. The inference to be drawn from the Tibbs language is that if a convincing bluff is run on an occupant by an officer intent upon a search, any resultant leave to conduct a search does not fall within the consent exception to the Warrant Clause.

Lo-Ji Sales, Inc. v. State of New York, 442 U.S. 319, 99 S.Ct. 2319 (1979) presents facts with a slightly different – but nonetheless helpful – twist. There, the defendant ran a store which was in the business of selling books, films and other articles. Local police, believing the defendant maintained in his inventory pornographic works for sale, obtained a warrant to search the store. But the warrant was "open-ended," the generic equivalent of the long ago banished writ of assistance. Hence, the Court found the "warrant" wanting. Once again, the present case is factually similar. The Lo-Ji Court said, "After Lo-Ji's agent was placed under arrest and was aware of the presumed authority of the search warrant, his conduct complying with official requests cannot, on this record, be considered." At 442 U.S. 329.

In the present case, Ms. Vlasova's "consent" was given during the context of an aggressive interrogation in the presence of half-a-dozen law officers of differing pedigrees. The Interrogator clearly represented that the search would have been inevitable. That is, if

12

she had refused the Officers access to her residence, a warrant would have been a foregone conclusion.

Once again, when Ms. Vlasova asked the Interrogator whether the prospective issuance of a warrant was certain, he replied with the unqualified assurance that it was. It was clear, at least to Ms. Vlasova, that her residence would be searched, whether she agreed to it or not. Since the choice to agree or disagree was entirely empty of authority, it had no significance at all. Ms. Vlasova's consent was noting more than a surrender to the inevitable. This is exactly what is meant by the words "mere acquiescence" in Bumper.

Moreover, the process of extracting a "consent" from Ms. Vlasova takes up several pages of the transcript,[17] as this Court may note. But it was not a simple "may we" request. Rather, it was a series of questions and answers -- a resumption of the interrogation, really -- in which questions suggestive of incriminating responses were put to Ms. Vlasova. Also contained in the dialogue were statements indirectly extolling the benefits of "cooperation." Her answers to the questions in this section of the exchange may be taken as inculpatory. Certainly, her ultimate agreement to a proposed search opened the door, as it were, to the discovery of further unfavorable evidence. The exchange following Ms. Vlasova's request for Counsel ought never to have taken place, and was clearly impermissible under Edwards, supra, and its progeny.

While the Interrogator's battery of questions and statements preceding the search agreement were not physically threatening, it amounted to much more than a simple request. The Interrogator kept prodding Ms. Vlasova until she relented. This sort of "consent" is constitutionally unacceptable, "...whether permission was obtained by coercive measures or under inherently coercive circumstances." United States v. Barnett, 989 F.2d 546, 554-555 (1st Cir. 1993), emphasis added.

   3. The Computer Warrant and Search were Tainted and Therefore Invalid.

---

[17]  Pages 1 5-22 of Exhibit 1.

Upon the application of Trooper Huber, a warrant for the search of Ms. Vlasova's electronic equipment issued on May 9, 2005. The warrant was subsequently executed, revealing a wealth of data, much of which was unfavorable to Ms. Vlasova.

The warrant affidavit information, the warrant itself, the search and its yield were all tainted by the prior illegalities of Edwards and Bumper violations argued above. Therefore, the product of the search ought to be excluded as "fruit of the poisonous tree." In the case of the Edwards transgression, the matter became irrevocably infected at the point where Ms. Vlasova's invocation of Counsel was ignored. Under the rationale of Bumper, if the initial search was infirm, its product – the computer equipment – was infirm. The subsequent computer warrant and search fall constitutional victim to the same taint.

In the matter of the Fourth Amendment breach described by the Bumper Court and the decisions issue of Bumper, once the constitutional infection attaches, it carries into any derivative evidence,[18] all of which must be suppressed. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407 (1963).

The existence of taint in Ms. Vlasova's uncounselled statements and the evidentiary discoveries stemming therefrom is governed by a principle different from Wong Sun, a Fifth Amendment analogue to Wong Sun.

Not all "fruits" of a constitutionally questionable interrogation are required to be suppressed. See, generally, United States v. Patane, 542 U.S.630, 124 S.Ct. 2620 (2004), in which the Court declined to extend the sweep of the Miranda[19] protections. Reading the Patane decision is hard going. The Court was, however, clear on the extent of Fifth Amendment safeguards:

_____

[18]  With certain exceptions here inapplicable.

[19]  Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966).

14

> [T]he Self-Incrimination Clause contains its own
> exclusionary rule. It provides that '[n]o person...
> shall be compelled in any criminal case to be a
> witness against himself.' Amdt. 5. Unlike the Fourth
> Amendment's bar on unreasonable searches, the Self-
> Incrimination Clause is self-executing. We have
> repeatedly explained 'that those subjected to coercive
> police interrogations have an automatic protection
> from the use of their involuntary statements (or
> evidence derived from their statements) in any
> subsequent criminal trial.' Chavez, 538 U.S., at 769... .

Patane, at 542 U.S. 642, first emphasis in original, following emphasis added. The

Edwards Court has it that "...an accused's request for an attorney is per se an invocation of

his Fifth Amendment rights... ." At 451 U.S. 477.

Therefore, Ms. Vlasova asks this Court to suppress all evidence in this lawsuit, direct

or derivative, beginning at the point of her request for counsel, and including, but not

limited to, her statements, the search of her dwelling, and the warrant and search involving

her computer equipment.

/s/Roger Witkin
ROGER WITKIN
BBO #531780
6 Beacon Street, Suite 1010
Boston, Massachusetts  02108
(617) 523-0027 (tel.)
(617  523-2024 (fax)

DATED:   April 10, 2006

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES

V.                                    INDICTMENT NO. 05-10181-NG

IRINA VLASOVA

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day a true copy of the within document was served

upon AUSA Seth Berman, United States Attorneys Office, 1 Courthouse Way, Suite

9200, Boston, MA, and Ronald Chisolm, Esq., 19 Olde Village Drive

Winchester, MA 01890, by mail and by electronic filing, which was e-filed this day.

                        /s/ Roger Witkin
                        Roger Witkin
                        6 Beacon Street, Suite 1010
                        Boston, MA 02108
                        Tel. 617 523 0027
                        Fax 617 523 2024
                        BBO No. 531780

DATE:    April 10, 2006

# EXHIBIT "1"

# COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

District Court Department
Brighton Division
Docket No. _____

```
COMMONWEALTH OF MASSACHUSETTS

            v.

IRINA VLASOVA
```

## INTERVIEW OF IRINA VLASOVA

Tuesday, May 3, 2005
_____, Massachusetts

PRESENT:

Special Agent Dean Tramontana
Trooper Richard Huber
Paul Durand
Paul Chisholm
Ed Amendola
Tom O'Leary
Irina Vlasova, Defendant

Legal Transcription Services
265 Laurel Street
Fall River, MA 02724
(508) 678-9503

COMMONWEALTH V. VLASOVA

2

1          INTERVIEW OF IRINA VLASOVA

2               INTERVIEWER:  [INAUDIBLE] present at the

3     State Police barracks, Irina Vlasova, who is in

4     custody [INAUDIBLE] victor Lima alpha sierra ostrich

5     victor alpha, date of birth of four thirteen 1971.

6               Also present, Trooper Richard Euber

7     [INAUDIBLE] police and Special Agent Dean Tramontana

8     of the United States [INAUDIBLE].

9               Have a seat.

10               And if you could speak up just so that

11     everything can be recorded.

12               We're going to ask you first some

13     questions about the incident [INAUDIBLE] you

14     understand that.

15               Is this your first arrest?

16               MS. VLASOVA:  Yes.

17               INTERVIEWER:  [INAUDIBLE]

18               MS. VLASOVA:  No.

19               INTERVIEWER:  No.

20               Do you understand why you're here today?

21               MS. VLASOVA:  [INAUDIBLE]

22               INTERVIEWER:  Can you explain to me why

23     you're here [INAUDIBLE].

24               MS. VLASOVA:  I don't know.

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                          3

1                    INTERVIEWER:  I thought you just said you

2        knew.

3                    MS. VLASOVA:  Well, uhm -- I [INAUDIBLE],

4        right?

5                    INTERVIEWER:  You may.

6                    MS. VLASOVA:  So I'll probably need

.7       somebody to talk to.

8                    INTERVIEWER:  Okay.  And [INAUDIBLE] call

9        that you just made prior to this, was that to an

10       attorney?

11                   MS. VLASOVA:  Actually, no.  I don't know

12       his number.

13                   INTERVIEWER:  Okay.  But --

14                   MS. VLASOVA:  [INAUDIBLE]

15                   INTERVIEWER:  You have an attorney,

16       though?

17                   MS. VLASOVA:  Well, I could find one.

18                   INTERVIEWER:  Okay.  But you don't

19       currently retain an attorney.

20                   MS. VLASOVA:  No.

21                   INTERVIEWER:  Okay.  No, that's fine.

22                   MS. VLASOVA:  [INAUDIBLE]

23                   INTERVIEWER:  No, that's fine.  I just --

24       I was just curious.

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA

4

1    We'll just let you know, you are in
2    custody for receiving stolen property. The two
3    boxes that were in your trunk were bought with
4    stolen credit cards. It is our belief that you are
5    well aware that those were stolen, that they were
6    bought with stolen credit cards. I have spoken -- I
7    spoke with you close to a year ago on a similar
8    situation where a package was delivered to your
9    other apartment with a stolen credit card and we
10   spoke to you about this.
11          Now, you have made statements to us that
12   when we explained to you what happened that you
13   understood, that you weren't going to do this any
14   more. And also we have a statement from you that
15   you made to -- I believe it was the Boston Police --
16          Was it the Boston Police?
17          UNIDENTIFIED MALE:  Boston Police.
18          INTERVIEWER:  Boston Police.
19          You made a statement to them on a
20   complaint that you made against your boyfriend
21   Victor, stating that he is running an EBay scam, and
22   so we know that you are well aware of some of the
23   situation that's going on.
24          MS. VLASOVA:  My statement two years ago?

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                          5

1                    INTERVIEWER:  I don't believe it was --

2                    UNIDENTIFIED MALE:  It was 2003.  That is,

3          police reports were filed.

4                    INTERVIEWER:  Two thousand three?

5                    MS. VLASOVA:  That's the arrest warrant

6          for him also?

7                    INTERVIEWER:  I -- I -- [INAUDIBLE]

8                    UNIDENTIFIED MALE:  No, the arrest

9          warrant's not from that.  That was the restraining

10         order you had taken out, you had taken out on --

11                   MS. VLASOVA:  [INAUDIBLE]

12                   UNIDENTIFIED MALE:  Yeah, you did --

13                   INTERVIEWER:  Right.

14                   UNIDENTIFIED MALE:  --- but you filed a

15         police report.

16                   MS. VLASOVA:  Yeah, I made [INAUDIBLE]

17         like that.

18                   UNIDENTIFIED MALE:  Whatever it was

19         saying.

20                   MS. VLASOVA:  [INAUDIBLE] angry.

21                   INTERVIEWER:  Uh-huh.  Well, I can

22         understand.  You must have been --

23                   MS. VLASOVA:  [INAUDIBLE] boyfriend.

24                   INTERVIEWER:  Yeah.  Well, absolutely.  I

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                          6

1        understand that.

2                But it's our belief, and we have quite a

3        bit of evidence that we've been looking at you for

4        quite a while, that this is not just one package

5        that you picked up today -- or, two packages you

6        picked up today but this is quite extensive.  And

7        we'll let you know that we are looking to prosecute

8        federally against you.

9                MS. VLASOVA:  Which means?

10               INTERVIEWER:  Which means that you'll be

11       up against the United States Government and not

12       Massachusetts, because you're shipping packages that

13       have been procured and stolen across state lines.

14       So --

15               UNIDENTIFIED MALE:  We're also looking at

16       money laundering.

17               INTERVIEWER:  Right.

18               UNIDENTIFIED MALE:  For selling the items,

19       selling the items on EBay and then taking the cash.

20       So we're looking at money laundering also, which

21       carries a twenty-year sentence.

22               MS. VLASOVA:  I didn't steal [INAUDIBLE]

23       talking about with stolen credit cards.

24               INTERVIEWER:  We're offering you the

COMMONWEALTH V.  VLASOVA

7

1        chance --

2                MS. VLASOVA:  I'm -- yeah.

3                INTERVIEWER:  -- to help us out.  You can

4        make any statements that you feel will help us to

5        understand what it is that you think you're doing

6        and how your business is actually running.  You

7        know, you can explain to us how it's a legitimate

8        business, if you wish.

9                Like I say, you do have the right to have

10       an attorney if you would like to do that.

11               UNIDENTIFIED MALE:  This is your only

12       opportunity right here.

13               INTERVIEWER:  We're going to --

14               UNIDENTIFIED MALE:  To tell us what is

15       going on.  We know what's going on but here's your

16       opportunity to get a little more leniency.

17               MS. VLASOVA:  What's "leniency"?

18               UNIDENTIFIED MALE:  Well, you know,

19       obviously there's a lot of items that we -- we've

20       followed from those accounts.  You know -- you get

21       prosecuted on a multitude of charges or you either

22       go on a small amount of charges.  Everything's in

23       your name.  Everything is in your name.

24               MS. VLASOVA:  What's on my name?

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                      8

1               INTERVIEWER:  You name it.

2               MS. VLASOVA:  What is on my name?

3               INTERVIEWER:  Victor has taken very good

4       care of himself, to make sure that the finger points

5       to you.

6               MS. VLASOVA:  What is on my name?

7               You have to tell me.

8               INTERVIEWER:  You name it, it's in your

9       name.  There's nothing in Victor's name.

10              UNIDENTIFIED MALE:  Nothing in Victor's

11      name.

12              MS. VLASOVA:  I don't understand what is

13      on my name.

14              INTERVIEWER:  From the house to the car to

15      the accounts -- everything.

16              UNIDENTIFIED MALE:  To the return

17      addresses, to where you're sending these items.

18      Your name's on it.

19              MS. VLASOVA:  This is my address, my bank

20      or whatever, credit cards --

21              UNIDENTIFIED MALE:  That EBay is all --

22      yup, and the EBay account we know is all attached to

23      your account, your Citizens bank account.

24              MS. VLASOVA:  Right.  But I'm not stealing

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA

9

1       [INAUDIBLE].

2                   INTERVIEWER:  You're not stealing

3       yourself --

4                   MS. VLASOVA:  I don't know --

5                   INTERVIEWER:  -- you're stealing with

6       someone else?

7                   MS. VLASOVA:  No, I'm not -- I don't know

8       who's stealing besides [INAUDIBLE] credit cards.  I

9       just sell.

10                  INTERVIEWER:  But where do you get them

11      from?

12                  MS. VLASOVA:  It's -- well, again, I would

13      have to talk to somebody before.

14                  I'm not getting it, I'm getting it from

15      internet connections.

16                  INTERVIEWER:  I know, I heard this story a

17      year ago.

18                  MS. VLASOVA:  Some -- well, that's --

19                  INTERVIEWER:  And you knew then, when I

20      explained it to you.

21                  MS. VLASOVA:  Well --

22                  INTERVIEWER:  That it was stolen.

23                  MS. VLASOVA:  Well, you know exactly for

24      sure when it's stolen when you say [INAUDIBLE] that

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                            10

1       it's stolen.

2                    UNIDENTIFIED MALE:  And then, you know,

3       another thing is we're going to have to see if

4       Helen's involved.

5                    MS. VLASOVA:  Who?

6                    UNIDENTIFIED MALE:  Helen?

7                    Is that your sister?

8                    MS. VLASOVA:  No.

9                    UNIDENTIFIED MALE:  It's not?

10                   MS. VLASOVA:  No.

11                   UNIDENTIFIED MALE:  Who's Helen?

12                   MS. VLASOVA:  Helen is my mother.

13                   UNIDENTIFIED MALE:  Down in Dedham?

14                   MS. VLASOVA:  Yeah.

15                   UNIDENTIFIED MALE:  Okay.  Anybody who

16      uses that account --

17                   MS. VLASOVA:  Well --

18                   UNIDENTIFIED MALE:  -- is going to get

19      dragged into this.  Understand?  Anybody.

20                   MS. VLASOVA:  What account?

21                   UNIDENTIFIED MALE:  The EBay account.

22                   MS. VLASOVA:  Nobody uses that account

23      except me.

24                   UNIDENTIFIED MALE:  Except you?

LEGAL TRANSCRIPTION SERVICES

1          MS. VLASOVA:  My mother doesn't use this

2     account.

3          UNIDENTIFIED MALE:  She doesn't use -- so

4     everything on there you sell?

5          MS. VLASOVA:  It's -- it's -- my mother

6     doesn't even know that I have EBay account.

7          INTERVIEWER:  So you're saying that

8     everything that has come through that account on

9     EBay has been sold by you.

10          [MUSIC BEGINS TO BE HEARD IN BACKGROUND]

11          MS. VLASOVA:  I'm not -- well -- no, for

12     sure, my mother doesn't even have access to

13     computer.

14          INTERVIEWER:  That's not what I'm asking.

15          You're saying you are the seller of

16     everything on that EBay account.

17          MS. VLASOVA:  In general -- [MUSIC IN

18     BACKGROUND BECOMING LOUDER]

19          In general  I am the seller.

20          INTERVIEWER:  And you are the only seller.

21          MS. VLASOVA:  I might be not the only

22     seller.  [MUSIC IN BACKGROUND BECOMING LOUDER]

23          I might be, I don't know.  I have to talk

24     to my lawyers before.

COMMONWEALTH V. VLASOVA                                    12

1              INTERVIEWER:  Okay.  I'm not offering this

2       chance again to help yourself.

3              MS. VLASOVA:  What chance?

4              INTERVIEWER:  You can -- you can --

5              MS. VLASOVA:  [INAUDIBLE]

6              INTERVIEWER:  You can talk --  hold on,

7       hold on.  That's fine, you have a right to have an

8       attorney.  I've already explained that to you, but

9       we're going forward processing you through Brighton

10      District Court today, and we will be adding on the

11      entirety of this case, and we'll be looking to move

12      you into Federal Court on the presumption that you

13      run the EBay account, you're the one that sold

14      everything on that -- on the entirety of that list

15      that we have of stolen goods that have moved through

16      your account is yours.

17             Are we clear on that?

18             MS. VLASOVA:  Uhm -- well, those items are

19      not mine, I'm just selling them.

20             INTERVIEWER:  Once you sell them, you're

21      claiming ownership.  You can't sell something that

22      you don't own.  If you put something up on EBay, you

23      have to have had ownership of that item.

24             MS. VLASOVA:  Where does it say that?

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                                    13

1              INTERVIEWER:  It's common just knowledge.

2       You can't sell something that you don't own.

3              MS. VLASOVA:  If somebody ask me to I

4       can't?

5              INTERVIEWER:  Well, I don't understand

6       what that means because you won't explain it to me.

7              MS. VLASOVA:  If somebody asks me to sell

8       something [INAUDIBLE].

9              INTERVIEWER:  It's still on you.

10             MS. VLASOVA:  What?

11             INTERVIEWER:  It's still on you.

12             MS. VLASOVA:  Still on me?

13             INTERVIEWER:  Yeah.  Still your

14      responsibility for what you posted on that EBay

15      account.

16             MS. VLASOVA:  If I don't know --

17             UNIDENTIFIED MALE:  He's going to try to

18      wipe his hands clean and push everything on you, do

19      you understand that?

20             MS. VLASOVA:  Well --

21             UNIDENTIFIED MALE:  I hope you really love

22      him because that's what's going to happen here.

23      He's illegal, we know that, we know his status but,

24      you know, this is -- like we said, this is your

LEGAL TRANSCRIPTION SERVICES

1           golden opportunity right now to come clean.

2                      We know that this stuff -- we know how it

3           was ordered, where it was ordered, that it was put

4           on at EBay.  That 59 Harris Street, we know there's

5           a lot of stuff in there that we can use against you.

6                      MS. VLASOVA:  So what do you want from me?

7            I don't understand.

8                      UNIDENTIFIED MALE:  [INAUDIBLE]

9                      Where's the stuff coming from?

10                     MS. VLASOVA:  The stuff is coming from

11          internet connections that I have, not even me.

12                     [INAUDIBLE]

13                     INTERVIEWER:  [INAUDIBLE]

14                     Stopping tape for one moment.

15          (INTERVIEW SUSPENDED.)

16                     INTERVIEWER:  Okay.  Restarting tape at

17          twelve-fifteen.  Same parties as before.

18                     Irina, it's your contention that you don't

19          want to speak with us, you want an attorney, is that

20          right?

21                     MS. VLASOVA:  I would like to talk to one,

22          yes.

23                     INTERVIEWER:  Okay.  We're going to end

24          the conversation now.

COMMONWEALTH V. VLASOVA                                              15

1           We will ask one further question, to ask

2       if we could have your consent to search your

3       apartment.

4           MS. VLASOVA:  Excuse me?

5           INTERVIEWER:  We're going to ask you for

6       your consent to search your apartment.

7           MS. VLASOVA:  You need my agreement to

8       search my apartment?

9           INTERVIEWER:  Yes.

10          We'll be looking to get a search warrant

11      anyway, for your apartment.  We're looking to see if

12      you would cooperate and allow us, with your consent,

13      to search the apartment to look for items either

14      that you've bought or sold, are holding or for

15      information that you have regarding your account on

16      EBay.

17          MS. VLASOVA:  What information regarding

18      my account on EBay?

19          INTERVIEWER:  Just things that have been

20      bought and sold, basically.

21          MS. VLASOVA:  So how soon you going to get

22      a search warrant?

23          INTERVIEWER:  It will be today.

24          MS. VLASOVA:  All right.  I understand.

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                              16

1           So, what are you going to look for?  The

2      items that I might keep in the house?

3           INTERVIEWER:  Yes.

4           MS. VLASOVA:  Is it going to be -- I'm

5      going to be there or --

6           INTERVIEWER:  We'll be going over to

7      Brighton Court at this time now.

8           MS. VLASOVA:  So what's next for me?

9           INTERVIEWER:  So -- you have to be

10     arraigned at Brighton Court, which means they have

11     to read the charges, you have to put in a plea of

12     guilty or not guilty and then they have to decide

13     whether you will be let out on bail or held.

14           MS. VLASOVA:  Uhm -- and what is your

15     suggestion before -- [INAUDIBLE].

16           UNIDENTIFIED MALE:  Well, we can see where

17     the stuff is from.  We know that you're the -- well,

18     you're --

19           INTERVIEWER:  We're not going to ask any

20     questions on that now.  You've made the statements

21     that you want an attorney, so we're not going any

22     further with that questioning.

23           MS. VLASOVA:  Okay.

24           INTERVIEWER:  We're just simply asking for

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                              17

1          your consent to look in your apartment to see if we

2          can fill in some of the holes on what's going on.

3                    MS. VLASOVA:  So, whether or not -- uhm --

4                    I'm sorry, it's just kind of strange for

5          me, sitting here.  I was not expecting anything like

6          this.

7                    INTERVIEWER:  Well, we're just

8                    MS. VLASOVA:  Because I didn't --

9                    INTERVIEWER:  -- looking to see -- whether

10         you're going to be -- you're going to cooperate and

11         allow us to look or be uncooperative and have us get

12         a search warrant and look.

13                   Basically the two things we're looking at

14         right now.

15                   MS. VLASOVA:  But I don't have anything in

16         [INAUDIBLE] apartment, yeah, you can look.

17                   INTERVIEWER:  Okay.  You've got nothing to

18         worry about then.

19                   MS. VLASOVA:  I'm not worrying, actually.

20                   INTERVIEWER:  So, you're saying -- you're

21         giving us consent to search the apartment --

22                   MS. VLASOVA:  Yes.

23                   INTERVIEWER:  -- at 59 Harris Street,

24         Brookline.

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                                    18

1           MS. VLASOVA:  Well, the only reason

2    [INAUDIBLE] is that, you know, I have my landlords

3    downstairs [INAUDIBLE].  You know -- [LOUDLY RINGING

4    TELEPHONE HEARD] -- [INAUDIBLE] with me, they would

5    -- [LOUDLY RINGING TELEPHONE HEARD] -- you know, two

6    old people [INAUDIBLE].

7              [LOUDLY RINGING TELEPHONE HEARD.]

8           INTERVIEWER:  [INAUDIBLE] we'll try to be

9    extremely discreet about [LOUDLY RINGING TELEPHONE

10   HEARD] getting in and out and not making a lot of

11   noise.

12          UNIDENTIFIED MALE:  If you can give us the

13   keys, [INAUDIBLE].

14             [LOUDLY RINGING TELEPHONE HEARD]

15          INTERVIEWER:  If you just give us the

16   keys, we don't have to [LOUDLY RINGING TELEPHONE

17   HEARD] ask --

18          MS. VLASOVA:  Otherwise, what, do you have

19   to bang on the door?

20          INTERVIEWER:  Well, I don't -- [LOUDLY

21   RINGING TELEPHONE HEARD] I did have to -- [LOUDLY

22   RINGING TELEPHONE HEARD] I could talk to the

23   landlord and ask for access to it or, you know, we

24   could have the keys [LOUDLY RINGING TELEPHONE

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                    19

1          HEARD], we could get in, do what we have to do and
2          leave and be as discreet as possible.
3                    MS. VLASOVA:  What is the -- I have to
4          find the word for this.
5                    What is this that there is against me --
6          what's the charge which --
7                    INTERVIEWER:  Receiving stolen property.
8                    MS. VLASOVA:  This is the charge which you
9          say?
10                   INTERVIEWER:  Yes.
11                   MS. VLASOVA:  And I don't [INAUDIBLE]
12         search my apartment?
13                   INTERVIEWER:  I'm asking for your consent
14         to search your apartment.
15                   MS. VLASOVA:  No -- uhm -- that's the
16         reason for asking for a search warrant, is that --
17                   INTERVIEWER:  Mn-hmm.
18                   MS. VLASOVA:  And go into my apartment and
19         search --
20                   INTERVIEWER:  Yes.
21                   MS. VLASOVA:  -- for something?
22                   INTERVIEWER:  For your records.  EBay
23         records.  And any packages that may have come in or
24         are ready to be shipped out.

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                            20

1           MS. VLASOVA:  [INAUDIBLE] I just don't

2      understand it's --

3           INTERVIEWER:  Well, I mean, I'm assuming

4      that if you're running a business and you're buying

5      products, selling products, that there are some

6      records on those sales.  There may not be.  You may

7      not keep any records, in which case we have -- we

8      won't be taking anything.  But that's just my belief

9      that there may be, you know, your business records

10     regarding your EBay sales.  Because you are a power

11     seller on EBay.

12          MS. VLASOVA:  Yes, [INAUDIBLE]

13          INTERVIEWER:  No.  So, I mean --

14          MS. VLASOVA:  [INAUDIBLE]

15          INTERVIEWER:  So, I mean -- I'm just

16     saying, if I had a -- if I was selling two hundred

17     some odd items, I'd have records of them, that's all

18     I'm saying.

19          And maybe you don't.  I don't know.

20          MS. VLASOVA:  No, I don't --

21          INTERVIEWER:  Okay.  Then --

22          MS. VLASOVA:  -- have any records.

23          INTERVIEWER:  Then we probably won't find

24     anything, but we're still asking for your consent to

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                               21

1          search for those things.

2                    Do we have that consent from you?

3                    MS. VLASOVA:  Well, anyway you're going to

4          get in there with a lot of noise, right?

5                    INTERVIEWER:  We'll try to get in there

6          with no noise, if I can.

7                    MS. VLASOVA:  [INAUDIBLE] search warrant,

8          right?  You're going to get in there with a lot of

9          noise.  For my landlords.

10                   INTERVIEWER:  Well, I mean, we're not

11         going to come in like a herd of elephants but, you

12         know, yeah, we'll probably make some noise, I don't

13         know.

14                   UNIDENTIFIED MALE:  We'll be as discrete

15         as possible.

16                   MS. VLASOVA:  I don't know.  I don't like

17         people going into my house without me being in

18         there, searching for stuff.

19                   INTERVIEWER:  That's your choice.  You

20         know, I've laid it out.  I'm asking you which route

21         we have to go.  Do we have to -- do we have your

22         consent or do we have to go get a search warrant.

23                   MS. VLASOVA:  Are you sure you're going to

24         get a search warrant?

COMMONWEALTH V. VLASOVA                                    22

1              INTERVIEWER:  Yes.

2              UNIDENTIFIED MALE:  And obviously, this

3      would show cooperation.

4              MS. VLASOVA:  Well -- I know I [INAUDIBLE]

5      but I mean it's -- my cooperation or not cooperation

6      is going to be the same thing.

7              Okay, you can go look.

8              INTERVIEWER:  We have your consent?

9              MS. VLASOVA:  Did you hear me?

10             INTERVIEWER:  Okay.  I'm going to stop

11     tape.  What we're going to do is just have you write

12     that down so that we have that on paper, that that's

13     what you're allowing, and we'll move forward from

14     there.

15             Stopping tape.

16     (INTERVIEW SUSPENDED.)

17             INTERVIEWER:  We're restarting tape again,

18     same date, May 3rd, at -- it is now twelve-thirty-

19     six p.m.  Irina Vlasova, Trooper Huber and

20     Agent Tramontana are still present.

21             Irina, it is your contention that you wish

22     to speak with us now?

23             MS. VLASOVA:  Yeah.

24             INTERVIEWER:  And just to get it straight,

1        this is done on your request, we did not ask you to

2        resume questioning again, you did this on your own

3        volition?

4                MS. VLASOVA:  I will say what I know.

5                INTERVIEWER:  Okay.  What I'm going to do,

6        because we have -- we have a rights form and you did

7        state that you wanted to speak to a lawyer.  Because

8        you're now changing your mind and you want to speak,

9        I'm going to read you your rights again so that we

10       are clear that you're clear on that, and if you can

11       sign it again, just stating that you understand

12       these rights, nothing has been promised to you to

13       have you start talking again, you're doing this on

14       your own accord, that you wish to speak with us, am

15       I right?

16               MS. VLASOVA:  Yes.

17               INTERVIEWER:  Okay.  Let me just read the

18       rights again.

19               Before we ask you any questions you must

20       understand your rights.  You have the right to

21       remain silent.  Anything you say can be used against

22       you in Court.  You have the right to talk to a

23       lawyer for advice before we ask you any questions.

24       You have the right to have a lawyer with you during

COMMONWEALTH V. VLASOVA                                          24

1          questioning.  If you cannot afford a lawyer, one

2          will be appointed for you before any questioning, if

3          you wish.  If you decide to answer questions now,

4          without a lawyer present, you have the right to stop

5          any time.

6                    Do you understand those rights?

7                    MS. VLASOVA:  Yes.

8                    INTERVIEWER:  Okay.  Once again, I'm going

9          to date and time this notice and have you sign it.

10    (PAUSE.)

11                    INTERVIEWER:  Have you sign on that line    .

12          there.

13    (PAUSE.)

14                    INTERVIEWER:  Okay.  And so what

15          information is it that you'd like us to know --

16          have some better understanding of.

17                    MS. VLASOVA:  About my EBay selling.

18                    INTERVIEWER:  Okay.

19                    MS. VLASOVA:  The stuff you're trying to

20          say was [INAUDIBLE] trying to say that I [INAUDIBLE]

21          credit cards [INAUDIBLE], that's what you're saying?

22                    INTERVIEWER:  I'm saying that the

23          majority, if not all of the items, have been bought

24          with stolen credit card numbers.

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                    25

1            MS. VLASOVA:  Okay.  I just want to say

2       that I am unaware of that, that it was stolen credit

3       cards.

4            INTERVIEWER:  And how did you think that

5       they were bought?

6            MS. VLASOVA:  I don't know.  I pay money

7       to a person [INAUDIBLE].

8            INTERVIEWER:  Who is this person that you

9       pay the money to?

10           MS. VLASOVA:  The person lives in Russia.

11           INTERVIEWER:  Okay.  I've heard this story

12      last year.

13           MS. VLASOVA:  It is the same story and --

14      you know -- this person lives in Russia.  That's my

15      knowledge [INAUDIBLE].

16           INTERVIEWER:  And are you saying that you

17      thought that this was a legitimate business

18      transaction?

19           MS. VLASOVA:  Well, I never question --

20      [INAUDIBLE].  Yes.

21           INTERVIEWER:  Okay.

22           MS. VLASOVA:  This is what I thought, that

23      it was a legitimate business, because I pay money

24      from the selling of this items.

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA

26

1           INTERVIEWER: Okay. Well, let's go
2      specifically on today.
3           The items that were left today that were
4      picked up by you and placed in your car -- and they
5      were there when you were stopped, that's why you
6      were arrested -- these packages were not left for
7      you, they were left for a party by the name of
8      Charles Carnell which neither you nor Victor in the
9      car are Charles Carnell, am I right?
10          MS. VLASOVA: Yes. I'm not Charles
11     [INAUDIBLE].
12          INTERVIEWER: Okay. Now, so, why exactly
13     are you picking up a package that's being left for
14     Charles Carnell at a location that is not your home?
15          MS. VLASOVA: I was asked.
16          INTERVIEWER: You were asked.
17          And how exactly did you go about doing
18     this?
19          We were observing you during this time.
20     Now, you pulled around to the back of the building,
21     and where did you go?
22          MS. VLASOVA: Did I do what?
23          INTERVIEWER: You pulled around to the
24     back of the building, on Strathmore, at

COMMONWEALTH V. VLASOVA

27

1    164 Strathmore, you backed your car in the back, and

2    where did you go from there?

3            MS. VLASOVA:  I didn't go anywhere.

4            INTERVIEWER:  How did you get the

5    packages?

6            MS. VLASOVA:  [INAUDIBLE]

7            INTERVIEWER:  I'm asking you the question.

8            MS. VLASOVA:  Well --

9            INTERVIEWER:  You know, you're not here

10    to --

11            MS. VLASOVA:  Well, there is some  --

12            INTERVIEWER:  -- give me little bits and

13    pieces.  You said you wanted to talk.  I'm asking

14    you how you --

15            MS. VLASOVA:  I'm not here -- I'm not

16    trying to, you know, laugh or something.

17            INTERVIEWER:  No, I know, I don't -- I

18    don't want to dance around --

19            MS. VLASOVA:  No, it's just -- whatever I

20    say at this particular moment on any particular

21    thing, you know, you can turn it around just like --

22            INTERVIEWER:  I'm asking you just to tell

23    me exactly what happened.  All right?

24            We watched you and Victor walking around,

LEGAL TRANSCRIPTION SERVICES

28

1    being all suspicious, checking out the vehicles in

2    the area, making sure nobody's watching you, you're

3    in and out, you're there waiting for the FedEx

4    truck.

5            UNIDENTIFIED MALE:  You left a note.

6            INTERVIEWER:  You left a note on the door

7    saying "please just leave the box."  And then you

8    disappeared into the back of the building, and you

9    got in the building somehow.

10           MS. VLASOVA:  I didn't leave any note.

11           INTERVIEWER:  I'm asking you how you got

12   into the building.

13           MS. VLASOVA:  I didn't leave any note.

14   You said I left a note, that's not -- I haven't left

15   any note.

16           INTERVIEWER:  Okay.  Well, you may want to

17   say that Victor left that, I don't know what you're

18   going to say about that.

19           MS. VLASOVA:  [INAUDIBLE]

20           INTERVIEWER:  No.  We have the note.

21           MS. VLASOVA:  What note?

22           INTERVIEWER:  I'm not going to get into

23   tit-for-tat but we have the note.

24           So, I'm asking you how you got into the

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                              29

1       building.

2                   MS. VLASOVA:  Well --

3                   I'm sorry.  Uhm -- I really confused right

4       now, so I probably should --

5                   INTERVIEWER:  So you really didn't want to

6       talk, you wanted to tell me a story --

7                   MS. VLASOVA:  No, I didn't want to tell

8       you story, I told you what I know about that.  That

9       I was asked to pick up the package.

10                  INTERVIEWER:  Can I be blunt about this?

11                  MS. VLASOVA:  [INAUDIBLE]

12                  INTERVIEWER:  Can I be blunt about what

13      I'm going to say?

14                  You're lying to me.  And I know it and you

15      know it.  And everybody knows it.  Okay?

16                  You're trying to tell me little bits and

17      pieces so you think that I'll believe you, like you

18      think I believed you the last time, and leave you

19      alone, and that's not going to happen this time.

20                  MS. VLASOVA:  Well --

21                  INTERVIEWER:  That's not going to happen

22      this time.  Okay?

23                  You do this at all kinds of addresses all

24      around the area.  You scoop the packages off the

COMMONWEALTH V. VLASOVA                                    30

1       doorstep and you go back and you resell it on EBay.

2        And you can't tell me that you think it's

3       legitimate business when you leave different

4       addresses all over the town for packages to be

5       delivered.  If it was a legitimate business, they'd

6       be delivered to your apartment at 59 Harris Street,

7       and they're not.

8                    So it's not -- it's -- you can try to pass

9       that off to a jury, let's see if a jury believes you

10      when they see that packages are left on different

11      people's stoops, instead of being delivered to you,

12      and you guys sneak around and pick them up and then

13      resell them.

14                   Do you think a jury's going to believe

15      that?

16                   UNIDENTIFIED MALE:  And you're going to be

17      responsible for everything that happened at

18      175 Freeman.

19                   INTERVIEWER:  We've already pulled the

20      records -- we've already subpoenaed the records from

21      175 Freeman, on every package that was signed down

22      at the front desk by you or Victor.

23                   And those were stolen items.

24                   MS. VLASOVA:  Which I was not aware of.

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                                31

1              INTERVIEWER:  Well, you know, you keep
2        saying this but --
3              MS. VLASOVA:  Because this is true.
4              INTERVIEWER:  Uh-huh.
5              MS. VLASOVA:  I was not aware of
6        [INAUDIBLE].
7              INTERVIEWER:  But you were aware of it
8        after I spoke with you back a year ago, because I
9        told you.
10             So you can't -- after that meeting with me
11       and you, you can't claim ignorance any more.  You
12       can't say "I didn't know" because I told you that
13       these items were stolen.
14             And at the time the statement back to me
15       was, well, fifty percent of the stuff on EBay is
16       stolen.
17             You know, that's not really a defense.
18             So, is that the only thing you're going to
19       tell us?  Is that what you want us to know?
20             Because that really doesn't help me one
21       bit.  That just is you trying to dance around what's
22       happening.
23             MS. VLASOVA:  All I'm saying is I was not
24       aware that the packages are stolen [INAUDIBLE].

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                         32

1                    INTERVIEWER:  Let me ask you straight up.

2           Did you think these items were stolen?

3                    MS. VLASOVA:  No.

4                    INTERVIEWER:  Where did you think they

5           were coming from?

6                    MS. VLASOVA:  I knew they were coming from

7           a business.

8                    INTERVIEWER:  A business or many

9           businesses?

10                   MS. VLASOVA:  Some businesses.  In Russia.

11                   INTERVIEWER:  So what would you say if I

12          found information that showed you had contacts with

13          a lot of different businesses that these things were

14          bought from?

15                   MS. VLASOVA:  Say again?

16                   INTERVIEWER:  What would you have to say

17          to the statement -- if I could show that you had

18          contacts with different businesses to purchase these

19          things, and not from one specific place.

20                   MS. VLASOVA:  I don't understand the

21          question.

22                   INTERVIEWER:  Okay.

23                   MS. VLASOVA:  Sorry.

24                   INTERVIEWER:  Well, we won't go any

LEGAL TRANSCRIPTION SERVICES

COMMONWEALTH V. VLASOVA                                     33

1        further then.

2                MS. VLASOVA:  [INAUDIBLE]

3                INTERVIEWER:  Well, I feel that we're at a

4        dead-end here, because you're just going to keep

5        saying "I didn't know they were bought with a stolen

6        credit card," when I already explained to you a year

7        ago that they were being bought with a stolen credit

8        card, when you tried to tell me the same thing about

9        this gentleman in Russia who was shipping you these

10       things, that you were paying him, and I explained to

11       you that this was a scam.

12               And you've known that it's been a scam

13       because you reported to the Boston Police that

14       Victor was involved in an EBay scam.  So, it's up to

15       you.  You try to convince a jury that you didn't

16       know that they were stolen.  A lot of evidence

17       points otherwise.

18   (END OF TAPED MATERIAL.)

19

20

21

22

23

24

COMMONWEALTH V. VLASOVA                                                          34

# C E R T I F I C A T E

I, Karen M. Nevins, do hereby certify that the foregoing transcript, pages 1 through 33, is a complete, true and accurate record of the aforementioned matter, prepared from an audio-cassette tape and CD containing identical recordings provided by Attorney Roger Witkin, to the best of my knowledge, skill and ability.

_____
Karen M. Nevins
Notary Public
My commission expires August 28, 2009

# EXHIBIT "2"

# RECORD AND RECEIPT FOR ITEMS SEIZED
## INCIDENT TO A SEARCH CONDUCTED ON: MAY 3, 2005

59 HARRIS ST, Brookline

1:30 PM → 2:45 PM

| TAG NO. | DESCRIPTION OF ITEMS SEIZED | LOCATION WHERE FOUND | FINDING OFFICERS |
|---|---|---|---|
| 1 | Gateway Model MFATXNT4IQWSOXLP4IL-CPU Serial #0053881233 | Den closet | SA Bradstreet (USSS) |
| 2 | MSRE reader/writer #LF2500 | Den closet behind cpu. | SA Bradstreet (USSS) |
| 3 | Sony Vaio Laptop - Model #PCG591L Serial #J0003844 | Living Room (Glass table) | SA Bradstreet (USSS) |
| 4 | Sony Vaio Laptop - Model #PCG6C1L Serial #30000005 | Living Room (wood table) | SA Bradstreet (USSS) |
| 5 | Misc papers/credit cards | Den closet | F.Sgt. Favuzza (MSP) |
| 6 | Misc papers | Den | Isp Purcell (USPIS) |
| 7 | Misc post office receipts | Living Room table top | Isp. Chisholm (USPIS) |
| 8 | ATM receipts/Misc paper | Closet Living room | Isp. Chisholm (USPIS) |
| 9 | FedEx Door Tag (DT1057 390 7382) | Living Room - under glass table (Dish) | Isp. Chisholm (USPIS) |
| 10 | Misc papers/UPS receipt | Kitchen | Sgt. Favuzza (MSP) |
| 11 | Vehicle - Receipts/credit card/boxes | | Trooper Hobec MSP |

| CERTIFIED INVENTORY OF EVIDENCE | SERIAL NUMBER 102 2005 CE 000061 |
|---|---|

**EVIDENCE HELD AGAINST** ☐ SPECIMEN

GILAVYAN VAHAGN

**CASE NO.** 102-767-0059050-S

**OFFICE** BOSTON FIELD OFFICE

**EVIDENCE INVENTORIED BY**

DEAN J. TRAMONTANA  5/3/05

SIGNATURE - SPECIAL AGENT          DATE

**DATE OF INVENTORY** 05/03/05    PAGE 1 OF 2 PAGES

**REVIEWING SUPERVISOR**

for  James Perry  5-3-05

TIMOTHY K. BUCKLEY

SIGNATURE          DATE

JENNIFER A. BUCKLEY  5-3-05

SIGNATURE - WITNESS          DATE

I certify the evidence described in the page(s) of this inventory, not otherwise disposed of per attached documentations, was verified for final retention at:  ☐ FSO   ☐ CFT.

SIGNATURE - DIVISION          DATE

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
|---|---|---|---|---|
| | | | THE LISTED BELOW ITEMS WERE SEIZED AS A RESULT OF A CONSENT TO SEARCH GRANTED BY IRINA VLASOVA ON 05/03/05.  THE ITEMS HAVE BEEN INITIALED AND DATED "DJT 05/03/05". "DJT" IDENTIFIES SA DEAN TRAMONTANA OF THE BOSTON FIELD OFFICE. | |
| 1 | 05/03/05 | 1 | ONE (1) GATEWAY DESKTOP CPU, MODEL NUMBER MFATXPNTMDW500XLP4H, SERIAL NUMBER 0031881233 WITH DISK CONTAINED IN DRIVE. | $500.00 |
| | | | TOTAL ⟶ | $500.00 |

UNITED STATES SECRET SERVICE

SSF 1544 (03/86)

(A) ORIGINAL WITH SIGNATURES TO CASE FILE
(B) 1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
(C) 1 COPY TO ADMINISTRATIVE FILE 710.101
(D) 1 COPY TO WORK FILE

FINAL
KAD

| CERTIFIED INVENTORY OF EVIDENCE | | | SERIAL NUMBER 102 2005 CE 000060 | |
|---|---|---|---|---|

**EVIDENCE HELD AGAINST** ☐ SPECIMEN

GILAVYAN VAHAGN

**CASE NO.** 102-767-0059050-S

**OFFICE** BOSTON FIELD OFFICE

**EVIDENCE INVENTORIED BY**

~~Dean J. Tramonta~~ 5/3/05

DEAN J. TRAMONTANA

SIGNATURE - SPECIAL AGENT          DATE

**DATE OF INVENTORY** 05/03/05     PAGE 1 OF 2 PAGES

**REVIEWING SUPERVISOR**

For ~~Tim Perry~~ TIMOTHY K. BUCKLEY     5-3-05

SIGNATURE          DATE

~~Jennifer a Buckley~~ 5-3-05

JENNIFER A. BUCKLEY

SIGNATURE - WITNESS          DATE

I certify the evidence described in the page(s) of this inventory, not otherwise disposed of per attached documentations, was verified for final retention at:     ☐ FSD     ☐ CFT.

SIGNATURE - DIVISION          DATE

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
|---|---|---|---|---|
| | | | THE BELOW LISTED ITEM WAS SEIZED AS A RESULT OF A CONSENT TO SEARCH GRANTED BY IRINA VLASOVA ON 5/3/05.  THE ITEM HAS BEEN INITIALED "DJT" AND DATED 5/3/05.  "DJT" IDENTIFIES SA DEAN TRAMONTANA OF THE BOSTON FIELD OFFICE. | |
| 1 | 05/03/05 | 1 | BOX CONTAINING ENCODER - MSRE 206 MODEL 5HL READER/WRITE WITH PACKING LIST. | NO VALUE |
| | | | TOTAL ⟶ | NO VALUE |

UNITED STATES SECRET SERVICE

SSF 1504 (03/86)

(A) ORIGINAL WITH SIGNATURES TO CASE FILE
(B) 1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
(C) 1 COPY TO ADMINISTRATIVE FILE 710.101
(D) 1 COPY TO WORK FILE

FINAL
KR

# CERTIFIED INVENTORY OF EVIDENCE

| SERIAL NUMBER |
| --- |
| 102 2005 CE 000059 |

**EVIDENCE HELD AGAINST** ☐ SPECIMEN

GILAVYAN VAHAGN

**CASE NO.**
102-767-0059050-S

**OFFICE**
BOSTON FIELD OFFICE

**EVIDENCE INVENTORIED BY**

DEAN J. TRAMONTANA    5-3-05
SIGNATURE - SPECIAL AGENT    DATE

*Jennifer A. Buckley*    5-3-05
JENNIFER A. BUCKLEY    DATE
SIGNATURE - WITNESS

**DATE OF INVENTORY**
05/03/05    PAGE   1   OF   2   PAGES

**REVIEWING SUPERVISOR**

For   *Perry*    5-3-05
TIMOTHY K. BUCKLEY
SIGNATURE    DATE

I certify the evidence described in the page(s) of this inventory, not otherwise disposed of per attached documentations, was verified for final retention at:   ☐ FSD   ☐ CFT.

SIGNATURE - DIVISION    DATE

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
| --- | --- | --- | --- | --- |
| 1 | 05/03/05 | 1 | THE BELOW LISTED ITEMS WERE SEIZED AS A RESULT OF A CONSENT GRANTED BY IRINA VLASOVA ON 05/03/05.  THE ITEMS HAVE BEEN INITIALED AND DATED "DJT 05/03/05". "DJT" IDENTIFIES DEAN TRAMONTANA OF THE BOSTON FIELD OFFICE.<br><br>ONE (1) SONY VAIO LAPTOP COMPUTER WITH POWER SUPPLY, MODEL NUMBERPCG-591L SERIAL NUMBER J0003B44 | $500.00 |
| | | | TOTAL ⟶ | $500.00 |

UNITED STATES SECRET SERVICE

SSF 1544 (03/86)

(A) ORIGINAL WITH SIGNATURES TO CASE FILE
(B) 1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
(C) 1 COPY TO ADMINISTRATIVE FILE 710.101
(D) 1 COPY TO WORK FILE

FINAL
KAD

| CERTIFIED INVENTORY OF EVIDENCE | | | SERIAL NUMBER 102 2005 CE 000058 | |
|---|---|---|---|---|

**EVIDENCE HELD AGAINST** ☐ SPECIMEN
GILAVYAN VAHAGN

**CASE NO.** 102-767-0059050-S

**OFFICE** BOSTON FIELD OFFICE

**EVIDENCE INVENTORIED BY** *Dean J. Tramate 5/3/05*
DEAN J. TRAMONTANA
SIGNATURE - SPECIAL AGENT           DATE

*Jennifer A. Buckley*  5-3-05
JENNIFER A. BUCKLEY
SIGNATURE - WITNESS           DATE

**DATE OF INVENTORY** 05/03/05     PAGE 1 OF 2 PAGES

**REVIEWING SUPERVISOR** *For James Perrul*   5-3-05
TIMOTHY K. BUCKLEY
SIGNATURE           DATE

I certify the evidence described in the page[s] of this inventory, not otherwise disposed of per attached documentations, was verified for final retention at:   ☐ FSD   ☐ CFT.

SIGNATURE - DIVISION           DATE

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
|---|---|---|---|---|
| | | | THE BELOW LISTED ITEMS WERE SEIZED AS A RESULT OF A CONSENT TO SEARCH BY IRINA VLASOVA ON 05/03/05. THE ITEMS HAVE BEEN INITIALED AND DATED "DJT 05/03/05". "DJT" IDENTIFIES SA DEAN TRAMONTANA OF THE BOSTON FIELD OFFICE. | |
| 1 | 05/03/05 | 1 | ONE (1) SONY VAIO LAPTOP COMPUTER WITH POWER SUPPLY, MODEL NUMBER PCG 6C1L, SERIAL NUMBER 3000005 | $500.00 |
| | | | TOTAL ⟶ | $500.00 |

UNITED STATES SECRET SERVICE                                    SSF 1544 [03/86]

(A) ORIGINAL WITH SIGNATURES TO CASE FILE
(B) 1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
(C) 1 COPY TO ADMINISTRATIVE FILE 710.101
(D) 1 COPY TO WORK FILE

FINAL
KAD

| CERTIFIED INVENTORY OF EVIDENCE | SERIAL NUMBER 102 2005 CE 000064 |
|---|---|

**EVIDENCE HELD AGAINST**  ☐ SPECIMEN

GILAVYAN VAHAGN

**CASE NO.** 102-767-0059050-S

**OFFICE** BOSTON FIELD OFFICE

**DATE OF INVENTORY** 05/03/05     PAGE 1 OF 2 PAGES

**EVIDENCE INVENTORIED BY** _Dean J. Tramonta_ 5/3/05

DEAN J. TRAMONTANA
SIGNATURE - SPECIAL AGENT     DATE

_Jennifer a Buckley_ 5-3-05
JENNIFER A. BUCKLEY
SIGNATURE - WITNESS     DATE

**REVIEWING SUPERVISOR**

For _Timothy K. Buckley_ 5-3-05
TIMOTHY K. BUCKLEY
SIGNATURE     DATE

I certify the evidence described in the page(s) of this inventory, not otherwise disposed of per attached documentations, was verified for final retention at:   ☐FSO   ☐CFT.

SIGNATURE - DIVISION     DATE

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
|---|---|---|---|---|
| 1 | 05/03/05 | 2 | THE BELOW LISTED ITEMS WERE SEIZED AS A RESULT OF A SEARCH INCIDENT TO ARREST IRINA VLASOVA. THE ITEMS WERE RECOVERED IN VEHICLE AND WERE A RESULT OF A CONTROLLED DELIVERY BY THE BOSTON FIELD OFFICE.<br><br>2 BOXES FULL OF CARDBOARD SHIPPED BY UBID (RESULT OF A CONTROLLED DELIVERY) | NO VALUE |
| | | | TOTAL ⟶ | NO VALUE |

UNITED STATES SECRET SERVICE

(A) ORIGINAL WITH SIGNATURES TO CASE FILE
(B) 1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
(C) 1 COPY TO ADMINISTRATIVE FILE 710.101
(D) 1 COPY TO WORK FILE

SSF 1544 (03/86)

FINAL
KAD

# CERTIFIED INVENTORY OF EVIDENCE

| SERIAL NUMBER | |
|---|---|
| 102 2005 CE 000066 | |

| EVIDENCE HELD AGAINST | ☐ SPECIMEN |
|---|---|
| GILAVYAN VAHAGN | |

**CASE NO.**
102-767-0059050-S

**OFFICE**
BOSTON FIELD OFFICE

**EVIDENCE INVENTORIED BY**
DEAN J. TRAMONTANA
SIGNATURE - SPECIAL AGENT    DATE

**DATE OF INVENTORY**    PAGE  1  OF  3  PAGES
05/03/05

**REVIEWING SUPERVISOR**

*Cynthia A. Buckley*  5-3-05
JENNIFER A. BUCKLEY
SIGNATURE - WITNESS    DATE

TIMOTHY K. BUCKLEY  5-3-05
SIGNATURE    DATE

I certify the evidence described in the page(s) of this inventory, not otherwise disposed of per attached documentations, was verified for final retention at:  ☐ FSD  ☐ CFT.

SIGNATURE - DIVISION    DATE

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
|---|---|---|---|---|
| | | | THE BELOW LISTED ITEMS WERE SEIZED AS A RESULT OF A CONSENT TO SEARCH GRANTED BY IRINA VLASOVA ON 05/03/05. THE ITEMS HAVE BEEN INITIALED AND DATED "DJT 05/03/05". "DJT" IDENTIFIES SA DEAN TRAMONTANA OF THE BOSTON FIELD OFFICE | |
| 1 | 05/03/05 | 1 | ENVELOPE CONTAINING WESTERN UNION RECEIPTS. | NO VALUE |
| 2 | 05/03/05 | 1 | ENVELOPE CONTAINING MISCELLENOUS PAPERS | NO VALUE |
| 3 | 05/03/05 | 1 | ENVELOPE CONTAINING UPS RECEIPTS | NO VALUE |
| 4 | 05/03/05 | 1 | ENVELOPE CONTAINING U.S. POSTAL SERVICE RECEIPTS. | NO VALUE |
| 5 | 05/03/05 | 1 | ENVELOPE CONTAINING MAGNETIC CALENDAR WITH PHONE NUMBERS AND LIST FOR MONDAY INDICATING "UPS" | NO VALUE |
| 6 | 05/03/05 | 1 | FED EX DOOR TAG (CONTAINED IN ENVELOPE) | NO VALUE |
| 7 | 05/03/05 | 1 | ENVELOPE CONTAINING ELEVEN (11) PHOTOS OF INSIDE IRINA VLASOVA'S APARTMENT, 59 HARRIS STREET IN BROOKLINE, MA., AND WRITTEN DIAGRAM OF APT. | NO VALUE |
| | | | TOTAL ⟶ | NO VALUE |

UNITED STATES SECRET SERVICE

SSF 1544 (03/86)

(A) ORIGINAL WITH SIGNATURES TO CASE FILE
(B) 1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
(C) 1 COPY TO ADMINISTRATIVE FILE 710.101
(D) 1 COPY TO WORK FILE

FINAL
KAD

| CERTIFIED INVENTORY OF EVIDENCE | | | SERIAL NUMBER 102 2005 CE 000067 | |
|---|---|---|---|---|

**EVIDENCE HELD AGAINST** ☐ SPECIMEN

GILAVYAN VAHAGN

**CASE NO.** 102-767-0059050-S

**OFFICE** BOSTON FIELD OFFICE

**EVIDENCE INVENTORIED BY** 5/3/05

DEAN J. TRAMONTANA

SIGNATURE - SPECIAL AGENT     DATE

**DATE OF INVENTORY** 05/03/05    PAGE 1 OF 3 PAGES

**REVIEWING SUPERVISOR**

TIMOTHY K. BUCKLEY    5-3-05
SIGNATURE    DATE

JENNIFER A. BUCKLEY 5-3-05
SIGNATURE - WITNESS     DATE

I certify the evidence described in the page(s) of this inventory, not otherwise disposed of per attached documentations, was verified for final retention at:  ☐FSD  ☐CFT.

SIGNATURE - DIVISION     DATE

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
|---|---|---|---|---|
| | | | THE BELOW LISTED ITEMS WERE SEIZED AS A RESULT OF A CONSENT TO SEARCH GRANTED BY IRINA VLASOVA. EACH ITEM IS INITIALED "DJT" AND DATED 5/03/05. "DJT" IDENTIFIES SA DEAN TRAMONTANA OF THE BOSTON FIELD OFFICE. | |
| 1 | 05/03/05 | 1 | COUNTERFEIT VISA, BANKONE 471.511030065 8742, EXPIRATION DATE 11/05, IN THE NAME OF IRINA VLASOVA (ATTACHED TO CARD NUMBER SEARCH PRINTOUT) | NO VALUE |
| 2 | 05/03/05 | 1 | COUNTERFEIT MASTERCARD, FIRST PREMIER BANK, 5222 7630 4021 4409, EXPIRATION DATE 06/05 IN THE NAME OF IRINA VLASOVA (ATTACHED TO CARD NUMBER SEARCH PRINTOUT) | NO VALUE |
| 3 | 05/03/05 | 1 | COUNTERFEIT MASTERCARD, CITIBANK, 5178 6000 00078628 EXPIRATION DATE 10/05 IN THE NAME OF IRINA VASOVA (ATTACHED TO CARD NUMBER SEARCH PRINTOUT) | NO VALUE |
| 4 | 05/03/05 | 1 | COUNTERFEIT VISA STANDARD CHARTED, 4032 3900 0004 7489, EXPIRATION DATE 08/06 IN THE NAME OF IRINA VASOVA (ATTACHED TO CARD NUMBER SEARCH) | NO VALUE |
| | | | TOTAL ⟶ | NO VALUE |

UNITED STATES SECRET SERVICE

SSF 1544 (03/86)

(A) *ORIGINAL WITH SIGNATURES TO CASE FILE*
(B) 1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
(C) 1 COPY TO ADMINISTRATIVE FILE 710.101
(D) 1 COPY TO WORK FILE

FINAL
KR

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
|---|---|---|---|---|
| | | | **Certified Inventory of Evidence** (Continuation Sheet) SERIAL NUMBER (FROM SSF 1544) 102 2005 CE 000067  PAGE 2 OF 3 PAGES | |
| | | | DATE OF INVENTORY 05/03/05  OFFICE BOSTON FIELD OFFICE  CASE NO. 102-767-0059050-S | |
| | | | BROUGHT FORWARD | NO VALUE |
| 5 | 05/03/05 | 1 | COUNTERFEIT MASTER CARD DREAM HOME DAH SING BANK, 54051070 0255 2944, EXPIRATION DATE 06/07 IN THE NAME OF IRINA VLASOWA (ATTACHED TO CARD NUMBER SEARCH PRINTOUT) | NO VALUE |
| 6 | 05/03/05 | 1 | ALTERED WESTERN UNION CARD 791 344 144 | NO VALUE |
| 7 | 05/03/05 | 1 | COUNTERFEIT VISA STANDARD CHARTERED 4018 0401 9003 0682 EXPIRATION DATE 11/06 IN THE NAME OF KAREN DANELYAN (ATTACHED TO CARD NUMBER SEARCH PRINTOUT) | NO VALUE |
| 8 | 05/03/05 | 1 | ALTERED VISA, FLEET BANK CHECK CARD 4326 2600 3320 5666, EXPIRATION DATE 03/07 IN THE NAME OF KAREN POGEOSYAN | NO VALUE |
| 9 | 05/03/05 | 1 | COUNTERFEIT MASTERCARD, HSBC 5178 6000 0006 5104, EXPIRATION DATE 04/05 IN THE NAME OF VAHAGN GILAVYAN (ATTACHED TO CARD NUMBER SEARCE PRINTOUT) | NO VALUE |
| 10 | 05/03/05 | 1 | COUNTERFEIT VISA STANDARD CHARTERED 4755 9800 0011 5958, EXPIRATION DATE 01/07 IN THE NAME OF VAHAGN GILAVYAN (ATTACHED TO CARD NUMBER SEARCH PRINTOUT) | NO VALUE |
| 11 | 05/03/05 | 1 | COUNTERFEIT VISA, STANDARD CHARTERED 4798 1526 0002 2195, EXPERATION DATE 11/05 IN THE NAME OF IRINA VASOVA (ATTACHED TO CARD NUMBER SEARCH PRINTOUT) | NO VALUE |
| 12 | 05/03/05 | 1 | COUNTERFEIT VISA DAH SING BANK 4707 9000 0014 5762, EXPIRATION DATE 11/04 IN THE NAME OF VAHAGN GILAVYAN (ATTACHED TO CARD NUMBER SEARCH PRINTOUT) | NO VALUE |
| 13 | 05/03/05 | 1 | BLACK WALLET | NO VALUE |
| 14 | 05/03/05 | 1 | BROWN WALLET | NO VALUE |
| | | | TOTAL ⟶ | NO VALUE |

UNITED STATES SECRET SERVICE

(A) ORIGINAL WITH SIGNATURES TO CASE FILE
(B) 1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
(C) 1 COPY TO ADMINISTRATIVE FILE 710.101
(D) 1 COPY TO WORK FILE

FINAL
KR

# EXHIBIT "3"

# SEARCH WARRANT

G.L. c. 276, §§ 1-7

NORFOLK COUNTY COURT DEPARTMENT

BROOKLINE DIVISION

SEARCH WARRANT DOCKET NUMBER
134-300 012

## TO THE SHERIFFS OF OUR SEVERAL COUNTIES OR THEIR DEPUTIES, ANY STATE POLICE OFFICER, OR ANY CONSTABLE OR POLICE OFFICER OF ANY CITY OR TOWN, WITHIN OUR COMMONWEALTH:

Proof by affidavit, which is hereby incorporated by reference, has been made this day and I find that there is **PROBABLE CAUSE** to believe that the property described below:

☐ has been stolen, embezzled, or obtained by false pretenses.
☒ is intended for use or has been used as the means of committing a crime.
☐ has been concealed to prevent a crime from being discovered.
☐ is unlawfully possessed or concealed for an unlawful purpose.
☒ is evidence of a crime or is evidence of criminal activity.
☒ other (specify) CONTAINS EVIDENCE OF CRIMINAL ACTIVITY

**YOU ARE THEREFORE COMMANDED** within a reasonable time and in no event later than seven days from the issuance of this search warrant to search for the following property:

INFORMATION CONTAINED ON THE BELOW LISTED COMPUTERS.

(1) GATEWAY DESKTOP HARDRIVE COMPUTER  SER# 003851233

(1) SONY VAIO LAPTOP COMPUTER  MODEL# PCG 591L  SER# 28156630 3215082

(1) SONY VAIO LAPTOP COMPUTER  MODEL# PCG-6C1L  SER# 3000005

☒ at:

ITEMS ABOVE  IN THE CUSTODY OF THE NEW ENGLAND ELECTRONIC CRIMES

TASK FORCE - HELD AS EVIDENCE

which is occupied by and/or in the possession of: _____

☐ on the person or in the possession of:

You ☐ are ☒ are not  also authorized to conduct the search at any time during the night.

You ☐ are ☒ are not  also authorized to enter the premises without announcement.

You ☐ are ☒ are not  also commanded to search any person present who may be found to have such property in his or her possession or under his or her control or to whom such property may have been delivered.

**YOU ARE FURTHER COMMANDED** if you find such property or any part thereof, to bring it, and when appropriate, the persons in whose possession it is found before the Brookline Division of the District Court Department.

DATE ISSUED  5/9/05

SIGNATURE OF JUSTICE, CLERK-MAGISTRATE OR ASSISTANT CLERK
X

FIRST OR ADMINISTRATIVE JUSTICE
WITNESS: Thomas MAY

PRINTED NAME OF JUSTICE, CLERK-MAGISTRATE OR ASSISTANT CLERK
Brian LAWLOR

## AFFIDAVIT OF TROOPER RICHARD P. HUBER

### INTRODUCTION

I, Trooper Richard P. Huber, hereby depose and state the following is true to the best of my knowledge, and belief:

1.      I am a Trooper with the Massachusetts State Police assigned to the New England Electronic Crimes Task Force. I have been a Trooper since June 13, 1988 and have received training in techniques of computer crimes and detection of same from the United States Secret Service as well as other specialized training in the working functions of the computers hardware and software systems. I have attended numerous check and credit card fraud working groups. I hold a Bachelors Degree in Criminal Justice from the University of Massachusetts/Boston.

2.      During the past two years I have been assigned to the New England Electronic Crimes Task Force I have been involved in dozens of cases involving various forms of financial crimes, many involving computers used to obtain goods fraudulently or replicate currency or other forms of bank notes.

3.      Based on the following information contained within this affidavit, I believe there is enough probable cause to believe that evidence seized at 59 Harris Street, Brookline, MA after a consent to search was given, specifically a Gateway desktop computer and two Sony laptop computers, will yield evidence to support a violation of M.G.L. 266/30, Larceny over $250, a violation of M.G.L. 266/60 Receiving Stolen Property, as well as various violations of M.G.L.266/37E, Identity Fraud when examined by a trained computer forensics expert of the United States Secret Service.

4.      Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are sufficient to establish the requisite probable cause for a search warrant.

### DESCRIPTION OF PROPERTY TO BE SEARCHED

5.      Items to be searched are a black Gateway computer serial number 0031881233, a Sony Vaio laptop computer Model #PCG-591L, serial number 28156630 3215082 and a Sony Vaio laptop computer, Model PCG-6C1L serial number 3000005.

### INVESTIGATION

6.      In December, 2004 the New England Electronic Crimes Task Force, with lead Special Agent of Dean Tramontana, began an investigation into a fraudulent credit card ring which had been purchasing items with the stolen card numbers and reselling items on EBay, an online auction site. The items being purchased with the fraud cards were being shipped to areas in and around Boston, generally in the Brighton and Brookline

1

areas. The amount of loss due to fraudulent purchases is believed to have reached approximately $123,000.

7.    Much of this information had been procured following an arrest in Rhode Island of KALININ, Maksim who claimed that after receiving ten fraudulent credit cards from a man known as HIDAKOV, Alex, he gave 3 of the cards to GILAVYAN, Vahagn (A.K.A. Victor) per order of HIDAKOV. KALININ then claimed that he, GILIVYAN and GILIVYAN'S girlfriend (whom he identified from a photo lineup as VLASOVA, Irina) purchased three laptop computers and one projector at a Staples store in Sturbridge MA on 11-7-03. The purchases were made at a register operated by an accomplice of KALININ who was employed at the store. Copies of the credit card slips signed by GILIVYAN and VLASOVA are held in evidence. He also provided the EBay account name of "shalunishka" that both suspects used to sell product.

8.    Between the dates of November 8, 2003 and November 12, 2003 three laptops and one projector were sold via EBay auction using an account named "shalunishka" which is registered to VLASOVA. This account remains active today and lists the account as a "power seller" having completed 273 sales since the account was activated on November 20, 2002. EBay records reveal that this account has sold product totaling $122,351.84. A breakdown of these sales by type show $114,554.90 in electronics; $7,029.56 in household items; and $767.35 in clothing.

9.    On 3-26-03 in a domestic violence police report with the Boston Police, VLASOVA claimed she is GILAVYAN'S girlfriend. She claimed that GILAVYAN is a computer hacker who used her computer to perpetrate fraud. She claimed he was doing a "scam" on EBay. VLASOVA has been linked to three of the addresses known to have received packages bought with fraudulent cards.

10.    In speaking with S/A Tramontana regarding this case I recalled the names of the suspects GILAVYAN and VLASOVA as parties I had spoken with on a similar case the prior year. During that incident, we had attempted a controlled delivery of 4 digital cameras (bought with stolen Discover card numbers) to the residence of GILAVYAN and VLASOVA at 175 Freeman Street #508, Brookline, MA. This address had been used to drop several fraudulently obtained items in the past. When the parties failed to come to the lobby to sign for the package, I along with S/A Murphy, Marino and Donohue went to the apartment and spoke with both subjects. They have denied knowledge of the items being stolen but claimed to have bought the items from someone in Russia. They did acknowledge reselling items on EBay. They were informed of the fraudulent nature of the purchases.

11.    In April of 2005 S/A Tramontana, in an undercover capacity made a purchase of a Sony Camcorder from the "shalunishka" EBay account listed to VLASOVA with a current address of 59 Harris Street, Brookline, MA. A second buy of a Sony Vaio laptop computer was made by S/A Fasulo of the Vermont Field Office of the United States Secret Service from the "shalunishka" account. After receiving the computer S/A Fasulo

2

used a SKU number on the box to trace the purchase back to UBid, an online auction site, who confirmed the computer had been purchased with a fraudulent credit card. The package had been sent by UBid to 80 St Paul Street, Brookline, MA, a confirmed vacant apartment.

12.    Based on my training and experience as well as information received by other law enforcement officers, it is known that those involved in criminal enterprise often use vacant apartments or locations where no one would be home during the day to have items shipped after fraudulently purchasing. It is believed that the suspects have used this mode of operation to further their criminal endeavors.

13.    According to EBay records of the "shalunishka" account, the majority of the recent fraudulent sales have originated using a computer linked to an internet provider address (IP) of 209.150.48.191, a static address located at 59 Harris Street, Brookline, MA.

14.    On 5-3-05, we received information from UBid of a delivery of two Sony VAIO computers due at 164 Strathmore Rd.#9, Brighton, MA. The computers had been bought from UBid's auction using a fraudulent credit card . The information had been stolen from a party in California, Charles Parnell, and his address changed to this Brighton address, which is a vacant apartment. A controlled delivery of the packages was made using an undercover US Secret Service Agent Bradstreet, with members of the Secret Service, State Police, and Postal Inspectors on surveillance. Prior to delivery, identification of VLASOVA and GILAVYAN was made on Strathmore Rd, with VLASOVA'S vehicle parked near #164. After delivery was made, the package being left at the request of a note purportedly from Charles Parnell to leave on the step, the suspects were seen casing the area for approximately 10 minutes before going behind the building to gain entrance, retrieving the packages and leaving in the vehicle. After a motor vehicle stop, both suspects were placed into custody after locating the packages in the trunk.

15.    During questioning of VLASOVA at the State Police barracks in Brighton by myself and S/A Tramontana, VLASOVA consented to a search of her residence at 59 Harris Street, Brookline, MA with the specific stated intent to search for items which may provide information on their business dealings on EBay. VLASOVA signed a written consent form prior to the search taking place.

16.    Removed from the residence during the search were a desktop computer, laptop computer, and a laptop computer. Also held in evidence were eleven (11) Visa cards which have been found to be fraudulent. The cards, bearing the names of GILAVYAN, VLASOVA, and DANIELYAN, Karen, had been re-encoded with a number other than that on the front of the card. An encoding machine was also held in evidence. The search was conducted under the supervision of Sergeant Robert Favuzza of the Massachusetts State Police. Assisting were S/A Edward Bradstreet, Postal Inspector Paul Durant, Postal Inspector Paul Chisholm, Brookline Police Detective Tom O'Leary and Brookline Police

3

patrolman Edward Amondola. These items were removed and held in evidence at the
Boston Field Office of the Secret Service.

17.    It is requested that an order to search the contents of the above listed computers
be given which it is believed will provide evidence of the criminal nature of the EBay
business practice of the suspects VLASOVA and GILAVYAN to include but not limited
to credit card numbers, known associates, sales receipts, fraud addresses and similar
items of this nature.

## SEARCHING COMPUTERS

18.    Based on my training and experience, as well as information given to me by those
in the computer forensics field, I know that computer data can be stored on a variety of
systems and storage devices.

19    *The Ability to "Undelete" Files.* When most computers, computer as a single
unit or network, store data, the operating software tells the CPU to assign the data a "file"
name (usually a pre-existing file name if it exists, or a name selected (inputted via
keyboard) by the user) and sends the data to a storage medium, typically either the "hard
drive" of the computer, the floppy drive, or some other peripheral storage device such as
a zip drive, tape drive, or writable compact disk (WCD). In order to manage the
inventory of all stored files, many operating systems also maintain a "File Allocation
Table" (FAT) which tells the CPU where all data is stored. The names (and actual
locations of the data on the hard drive or other storage medium) are recorded in the FAT
each time a "file" is saved, accessed, modified, transferred or otherwise affected. When a
file is "deleted" by a user, the computer does not in fact remove its data from the
designated storage medium, but, instead, alters the FAT to indicate that the space
previously consumed by that "deleted" data is now available to be overwritten with new
data if necessary. Typically, space that is consumed by "deleted" data is not overwritten
until all other unconsumed space is first written to or consumed (although this factor may
be affected by the type of the computer system and the use of certain operating software).
This fact is important in law enforcement since it means that so-called "deleted" files or
data are, in fact, often still present on the computer's storage medium (i.e. floppy disk,
hard drive, tape drive, etc.) and can be (and have been) recovered months, years, and
even decades after their deletion if the integrity of the computer system is maintained. In
my experience, it is not at all uncommon to be able to "undelete" deleted files or data
years after their deletion date. As the capacity of computers to store data rises each year,
the likelihood that previously "deleted" data has not yet been overwritten and is still
recoverable also rises concurrently. The result is that evidence of a crime, stored in a
computer system, may be recovered even after the passage of significant periods of time
and, in some instances, even after a deliberate attempt to destroy it.

20    *The Automated Creation of "Associated" Files.* In the vast majority of computer
systems, each time a file is received, transferred, modified, altered, or otherwise affected,
the computer will make some form of a notation or record of that event either in a "log"
of activity or by creating or modifying (at or about the same moment in time) a file

4

"associated" with the computer data file which witnessed the activity. For example, when files are received in most IBM-compatible systems using Microsoft Explorer as a software application to navigate the Internet, the file is loaded into a "Temporary Internet" directory and/or "cache" files, and the Internet address of the source of the file is logged or recorded into the "navigation" directories and files of Microsoft Explorer. At the same time, if a computer system contacts an Internet Website, the Website itself will transmit a "cookie" which is a short computer code which (using Microsoft Explorer as an example) is logged or recorded in the "Cookies" directory of the Internet browsing software. A "cookie" is a computer code logged into a receiving computer for future reference the next time that computer system contacts the Website. The use of cookies enables the Website administrators/owners to know if that computer system has previously visited the Website before. Generally speaking, these cookie and cache files are computer data files which are "associated" with the computer data file containing the image or data being downloaded (that is transmitted) from the Internet to a computer accessing a website on the Internet. Just as a card index system may be created to catalog a limitless number of features relative to the contents of a filing cabinet, so too may "associated" computer data files be created for a wide variety of software applications relative to other computer data files (and not just merely Internet communication and browsing). This recording and logging feature is not limited to IBM-compatible computers, but applies to various computer systems and computer programs although the name for the storage locations (e.g. "cache" or "cookie" file) may change depending on the computer system and the computer software. Through a careful and thorough analysis of files, which are in any way "associated" with a file of evidentiary significance, it is possible to:

a.   Identify where a computer system has "gone" or "visited" on the Internet;

b.   Where certain evidentiary computer data files were taken from the Internet;

c.   Who was at the keyboard at or around the time that certain computer data files of evidentiary significance were created, modified, printed or deleted (e.g. The downloading of images from a child pornography internet site might be immediately followed by a visit to the website of an employer)

d.   When the computer activity occurred.

21   *Computer data storage size.*   Today, computers are capable of storing vast quantities of data. Using printed text as an example, most commercially available computers today could easily store on their hard drives thousands and thousands of pages of text. If a computer uses additional storage media (e.g. floppy disks, tape drive tapes, zip drives, writable CDS, magneto optical drives, optical drives, etc.) the capacity for storage would be limitless.

22   *Encryption, Booby-traps, Hiding or Disguising Files.*   Today, computers are also capable of disguising or hiding data to hinder or prohibit its detection. Computers

5

are capable of encrypting data so as to make it un-retrievable by the average computer user. The Hi-Tech & Computer Crimes Division is in possession of computer software which is available to law enforcement and which will assist in breaking some forms of encryption, but the use of such software can be time consuming, depending upon the amount of data stored and the complexity of the encryptions. Attempting to decrypt data is an extremely time and equipment intensive process requiring a laboratory environment to be done effectively. Some users will purposefully rename files with otherwise innocuous file names to deter curiosity seekers and others. Similarly, computer users may also "Booby-trap" their computers or password protect their computer systems in an attempt to hide their activities and prevent the collection of evidence against them. The use of all such counter-detection methods are especially common in cases where a computer is used as an instrumentality to commit a crime.

23    *Data Files Are Easily Transferred* Transferring data files between computers or onto storage devices such as disks is a simple task that takes little time. As such, once a file is on one computer at a given location – particularly a home -- I believe that there is probable cause to believe that it could be moved to any storage device or other computer at that same location.

24.    *Request for Off-Premise Searching.* For the foregoing reasons, I request to search the above identified computer system components which have been transferred to a secured law enforcement location at the Boston Field Office of the United States Secret Service and have its contents forensically examined in a manner best suited to retrieve and preserve all evidence.

25.    *Request to Continue the Search past Seven Days and File a Warrant Return upon Completion of the Search.* Because of the complexity of conducting a thorough search of a computer, it may be necessary to make multiple image copies of the computer's storage systems, decrypt files, purchase special or additional application software or equipment or any of a host of other problems or issues which cannot truly be predicted until the computer is seized and its internal; and external configuration ascertained. As such, I am requesting permission to continue the search of the computer systems, which will be started within seven (7) days of the issuance of the search warrant required under Massachusetts law for so long as is reasonably necessary to conclude the search (even if such search extends beyond the seven day period beginning on the date of issuance of the search warrant but in no event for longer than 60 days beyond the date of the warrant) but for no longer than 60 days without receiving an additional search warrant. I further request permission to file a supplemental search warrant return upon completion of the search if the search continues beyond the time a search warrant return must be filed by statute.

26.    *Request to Allow Federal Agents of the United States Secret Service to Execute Search of Computer System under Supervision by a Sworn Law Enforcement Officer.* Because of the technical expertise needed to successfully execute a search of a computer system, it is necessary to have the assistance of a qualified computer forensics and hardware expert to execute the search for the computer system and to seize that system

9

without either altering evidence or otherwise compromising our ability to operate the computer in a secure forensics environment in order to search for the evidence detailed above while minimizing intrusiveness of the search and protecting officer safety. Furthermore, it is necessary to continue to draw on that individual's expertise during the search of any seized computer system.

## CONCLUSION

27.    Based on the above information, I submit there is probable cause to believe that in the Sony Vaio laptop computer Model #PCG-6C1L, serial # 3000005 seized as evidence during the consensual search at the 59 Harris Street, Brookline, MA address of GILAVYAN and VLASOVA , contains certain items which constitute evidence, instrumentalities and fruits of violations M.G.L. 266/30. M.G.L. 266/60, and M.G.L. 266/37E.

Signed under the penalties of perjury on this the 5th day of May, 2005.

Richard P. Huber
Massachusetts State Police