UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



UNITED STATES

V.                                    INDICTMENT NO. 05-10181-NG

IRINA VLASOVA

### DEFENDANT'S SENTENCING MEMORANDUM

The Defendant Irina Vlasova ("Ms. Vlasova"), in the above-numbered Indictment submits the following Memorandum for this Court's consideration prior to sentencing her.

**Facts.**

**1. Personal Background.**

Prior to her immigration to the United States, on August 25, 1997, Ms. Vlasova was raised in Moscow. She had one sibling and experienced a 'happy' childhood in a decent neighborhood. Her parents divorced when she was in high school, and she remained with her mother and sister Natalie. She did continue to keep in touch with her father, however. Ms. Vlasova's mother ultimately remarried, to Boris Goldstein, a man she met sometime around 1990. Her mother and step-father live in Dedham, Massachusetts. Ms. Vlasova became a naturalized United States citizen in November of 2004. Ms. Vlasova became involved with one Vagahn Gilavyan ("Gilavyan"), a man ten years her junior, with whom she began cohabiting in Brookline, Massachusetts. Gilavyan is a co-defendant in this lawsuit. After his arrest, he was detained,[1] and Ms. Vlasova moved in with her mother and step-father in Dedham.

---

[1] Gilavyan is slated for deportation to Armenia after his release from custody in the United States.

Ms. Vlasova claims to love Gilavyan, although in March of 2002, she obtained a restraining order against him for conduct involving threats against her, and her family, and threats to kill any other man she might date. Gilavyan, a 'computer hacker,' also represented that he would cause Ms. Vlasova's U.S. status to be computer-altered, making her subject to deportation. Further, Gilavyan left scores of threatening messages with her telephone voice mail. He even made menacing remarks concerning Ms. Vlasova's relatives in Moscow.

Ms. Vlasova is a good and attentive member of her blood family.

Her physical health has been poor for a substantial number of years. She developed Rheumatoid Arthritis some time ago, which was diagnosed in 1988. "She has severe joint pain and swelling requiring the use of several powerful medications." The medications have not been particularly effective in treating her condition. She has agreed to participate in a trial medication program, but "the study medication can increase the risk of serious infection… ."[2] In addition to her treatment by Dr. Donohue (see footnote), Ms. Vlasova has another caregiver, her primary care Physician Dr. Maria Gorbovistsky of the New England Medical Center. Whether as the result of her physical status, the medications or both, Ms. Vlasova experiences a wide variety of unpleasant symptoms. Additionally, she finds it extremely difficult to perform certain quotidian tasks such as dressing herself, opening cans and jars and other symptomology.

Her mental health is on a par with her physical health. That is, she experiences anxiety, depression and memory loss. In short, her ability to functionally conduct her life is severely curtailed.

---

[2] See August 16, 2006 letter of John P. Donohue, M.D., of the Beth Israel Deaconess Medical Center, attached hereto as Exhibit "A," and the November 29, 2006 letter from the same Physician, attached hereto as Exhibit "B."

Although she professes to miss her 'boyfriend- -- Gilavyan – it is a fair statement upon information and belief of Counsel, as well as the facts underlying the Indictment, that he is the direct cause of many of her problems, including those which bring her before this Court.

It is expected that Gilavyan will accept the responsibility for the scheme charged in the indictment, and that he will profess his insistence to Ms. Vlasova that she become involved in a plan of which she essentially had neither understanding nor any true awareness of the legal implications thereof.

2. The Offense Conduct.

At indeterminate times prior to May, 2005, Members of the Massachusetts State Police and others upon information and belief, including Federal authorities, conducted an investigation into certain allegations of Internet fraud.

This probe first focussed on Ms. Vlasova as a "witness/subject," and ultimately she became a "target." A six-count Indictment against her and Gilavyan ensued -- Conspiracy; mail fraud; fraudulent access devices; "device making equipment;" aggravated identity theft; and aiding and abetting.

The foundation of the Government's evidence against Ms. Vlasova involves claims that Gilavyan was in the business of ordering goods over the wire, paying for them with stolen credit cards, and in turn placing the property with Ms. Vlasova. Gilavyan made certain that much, if not most, of the transactions were accomplished with the use of Ms. Vlasova's name. Gilavyan tried to be careful about associating *his* name with the transactions, ensuring that Ms. Vlasova would be, in the end, a principal target and *appear* to bear most of the blame.

It is a fair statement that throughout the offense conduct Ms. Vlasova was at least confused, and perhaps mostly ignorant of the consequences of whatever her actions were. In fact, Gilavyan was the 'brains' of the operation and Ms. Vlasova was an unfortunate pawn in the mechanics of that operation.

This is not to say that she denies the gravity of her own conduct. She ultimately cooperated with the case investigators.

### 3. Status and Procedural Facts of the Case.

On October 30, 2006, Ms. Vlasova offered a plea of guilty to Counts 1-5 of the Indictment, pursuant to a plea agreement with the Government. Acceptance of the plea was deferred until the time of sentencing, which has been set for April 24, 2007. Counts 6 and 7 of the Indictment are to be dismissed against her at disposition of the case.

Gilavyan pled guilty to all seven Counts of the Indictment on October 30, 2006. His sentencing, originally scheduled for January 29, 2007, was rescheduled. To the best of Counsel's knowledge, Gilavyan's case has not yet been disposed.

A plea agreement was executed between Ms. Vlasova and the Government on September 6, 2006.[3] By the terms of the agreement, the Government offense calculations are slightly different from those of the Probation Department – see, below – in that the Government has assessed an eight level increase for loss under U.S.S.G. §2B1.1(b)(1)(E), where the Probation Department has assigned a ten level increase under U.S.S.G. §2B1.1(b)(1)(G).[4] Although the Probation Department may not be bound by this specific plea agreement reckoning, the Government is. And, although the

---

[3] The plea agreement letter itself is dated August 14, 2006.
[4] This is assumed to be a typographical error, the proper citation should have been U.S.S.G. §2B1.1(b)(1)(F).

Government has reserved the right to oppose any downward adjustment or departure arguments by Ms. Vlasova, it agrees they may be made.

Upon the best of Counsel's knowledge and belief, Gilavyan is expected – in one form or another – to exempt Ms. Vlasova from the greater *quantum* of responsibility for the offense conduct. In this, he is expected to admit that the concept, planning, execution and profits of the scheme took place chiefly at his behest, and that Ms. Vlasova acted at his direction at all times.[5]

### 4. Criminal History.

Ms. Vlasova does not have a criminal record – she has zero criminal history points and falls therefore into Criminal History Category I.

### 5. The Offense Calculus.

According to the Probation Department's calculations, Ms. Vlasova's base offense level is 7. Owing to an assessment of loss under Guidelines §2B1.1(b)(1)(G),[6] another 10 points has been added. And, under §2B1.1(b)(10)(A), a further 2 points have been assessed, resulting in an Adjusted Offense Level of 19. From this, because of Ms. Vlasova's acceptance of responsibility, 3 points have been deducted, leaving her with a Total Offense Level of 16.

Ms. Vlasova says the loss adjustment should find itself in §2B1.1(b)(1)(E) – for eight points, not ten – as agreed between the parties to this lawsuit in the Plea Agreement.

---

[5] Counsel asserts it is a telling factor that Gilavyan has been detained since his arrest on the instant allegations, while Ms. Vlasova has remained free on her recognizance, without incident. The Court may draw such inferences from this as it may.

[6] Once again, an apparent unintended error. The Subsection should be (F), not (G).

**Argument.**

    **1. Post-*Booker* Sentencing.**

In March of this year, the First Circuit decided United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006), establishing a sentencing protocol "as clearly as can be possible" in the aftermath of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005).

The beginning of the Court's opinion makes it unambiguous that "reasonableness" is the touchstone of post-Booker sentencing.[7] Hand-in-glove with that precept, the Court found that the United States Sentencing Guidelines were not "presumptively controlling," and that a Guidelines sentence was *not* "per se reasonable." 440 F.3d 518. Although the Guidelines are not simply "another factor" in the process of disposition, "[they] are still *generalizations*." *Id.*, emphasis in original.

"*Booker's* remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness." *Id.*

The holding in Booker has permitted the statutory sentencing mandates of 18 U.S.C. §3553[8] to emerge with new vitality and prominence, where they were, pre-Booker, effectively trumped. Or at least in part neutralized. Indeed, in his concurring Opinion, Judge Torruella states unequivocally:

---

[7] [S]entences would be reviewable for reasonableness whether they fell within or without the guidelines." Jimenez-Beltre, at 440 F.3d 517.

[8] Section 3553 has been raised pointedly in Defendant"s original Sentencing Memorandum. Because Jimenez-Beltre post-dates that document, the Court may forgive its further reference in the instant document.

> Finally, I think it is of *critical importance* that the majority opinion be understood to reinforce our commitment to the statutory requirement that, *in all cases*, district courts must impose sentences that are 'sufficient, but not greater than necessary' to effectuate the goals of criminal punishment, as articulated in 18 U.S.C. § 3553(a). In articulating its reasons for imposing any sentence, the district court must make clear reference to this *central principle*.

*Id.*, at 440 F.3d 521, emphasis supplied.

In *his* Concurring Opinion, Judge Howard put an even finer point on it:

> The so-called "parsimony" provision, which requires that sentences be only as long as necessary to serve the purposes listed in section 3553(a)(2), has received scant attention from courts. Commentators note that this provision " 'is not just another factor' to be considered along with others set forth in Section 3553(a)" -- it sets an independent limit on the sentence a Court may impose.

*Id.*, at 440 F.3d 526, citations omitted. Judge Howard also observed that the "parsimony" provision is the lead-off language in §3553. It is a charter clause, governing those sentencing provisions which follow it.

The Probation Department's calculus of Ms. Vlasova's total offense level and criminal history score places her in the 21-27 month Guidelines sentencing range. This is about two years, give or take three months. The bulk of the adjusted offense level is comprised of points assessed for valuation of loss and the extra two points for 'use of device-making equipment.'

> Ms. Vlasova challenges the Probation Department's calculus, not because it is mathematically in error, but because her circumstances are compelling enough to warrant a downward departure.

### 2. Aberrant Behavior.

Although perhaps not word-for-word in keeping with the suggested definitions of 'aberrant behavior,' it is Counsel's considered opinion that Ms. Vlasova nonetheless qualifies for a downward departure under Guidelines §5K2.20.

In order for the Court to do so, §5K2.20 requires a clean record, that the offense conduct not embrace violence, the use of weapons, drugs or physical injury to another, that the offense conduct represent a single transaction, and that the offense conduct be a 'marked deviation from an otherwise law-abiding life.' Ms. Vlasova meets these criteria, except that 'single criminal occurrence'[9] requires explication in the context of her circumstances.

'Single criminal occurrence' does not mean *one* act exclusively.

> That aberrant behavior departures are available to first offenders whose course of criminal conduct involves more than one criminal act is implicit in our holding. We think the Commission intended the word 'single' to refer to the crime committed and not to the various acts involved. As a result, we read the Guidelines' reference to 'single acts of aberrant behavior' to include multiple acts leading up to the commission of a crime, Any other reading would produce an absurd result. District courts would be reduced to counting the number of acts involved in the commission of a crime to determine whether departure is warranted. Moreover, the practical effect of such an interpretation would be to make aberrant behavior departures virtually unavailable to most defendants because almost every crime involves a series of criminal acts.

United States v. Grandmaison, 77 F.3d 555, 563 (1st Cir. 1996), citation omitted. This Circuit has rejected the 'narrow' view of what means 'single' act, "…saying that aberrancy should be based upon a totality of the circumstances." United States v. Rivera-Rodriguez, 318 F.3d 268, 275 (1st Cir. 2003). Among the factors which may be

considered under a 'totality of the circumstances' determination may include "pecuniary gain to the defendant," and "[s]pontaneity and thoughtlessness." *Id.* Also, a Court needs "...evaluate *all* the data in order to determine whether this offense is a 'marked departure from the past and is unlikely to recur.' " United States v. Iaconetti, 59 F.Supp.2d 139, 144 (D. Massachusetts. 1999), quoting from United States v. Bradstreet, 135 F.3d 46, 56 (1st Cir. 1998), emphasis supplied.

Albeit Ms. Vlasova's offense conduct involved several *acts*, from her standpoint, and even objectively, the offense conduct may be characterized as a single conspiracy with several components. Admittedly, the conspiracy claimed some temporal tenure. That alone, however, does not prevent this Court from entertaining the requested departure.

The *data* available to this Court suggest that Ms. Vlasova's criminal involvement did not find its genesis in a self-conceived criminal ideation on her part – Counsel suggests this was not a component of her personality – but rather in love. As 'corny' as that may sound, she would never have initiated a crime of any sort absent the impetus of Gilavyan and her affections for him.

She has no former record, either in this Country or her Country of birth, and the record is completely bare of any fact – or even suggestion – that she would be susceptible to recidivism.

Ms. Vlasova therefore respectfully asks this Honorable Court to consider a downward departure on grounds of aberrant behavior.

---

[9] §5K2.20(b).

### 3. Physical condition.

§5H1.4 of the Guidelines is clear in stating 'physical condition' "...is not *ordinarily* relevant in determining whether a departure may be warranted." [Emphasis supplied.] In so saying, the Section explicitly 'leaves the door open' for a sentencing Court to consider a downward departure on such grounds.

It is supported in the record that Ms. Vlasova suffers from extreme and virtually disabling physical infirmities. More, owing to the severity of her afflictions, she is subject to experimental treatment. The collateral effects of such treatment, as they may affect Ms. Vlasova, are not yet known. She should be under close medical supervision in these matters.

This Court will be asked to consider a sentence of supervised probation, with conditions, in the case of Ms. Vlasova. Should this Court decide that a sentence of imprisonment is indicated, however, she asks that the Court depart downward sufficiently enough to permit community incarceration, a circumstance under which she may sustain the best hopes – and medical attention – for the amelioration of her disease.

### 4. [Other] Grounds for Departure.

Guidelines §5K2.0(c) permits a sentencing Court to depart downward if there exist, in any given case,

> ...based on a combination of two or more offender characteristics or *other circumstances*, none of which independently is sufficient to provide a basis for departure, only if
>
> (1) such offender characteristics or other circumstances, taken together, make the case an exceptional one; and

>> (2) each such offender characteristic or other circumstance is –
>>
>>> (A) present to a substantial degree; and
>>>
>>> (B) identified in the guidelines as a permissible ground for departure, *even if such offender characteristic or other circumstance is not ordinarily relevant to a determination of whether a departure is warranted.*

[Emphasis supplied.]

Having asserted that she is worthy of a downward departure under two separate sections of the Guidelines, Ms. Vlasova does not concede that either is insufficient *in se* to warrant her requests. Should this Court feel otherwise, however, she is most certainly a candidate for a downward adjustment under the provisions of §5K2.0(c).

Ms. Vlasova has presented credible arguments for favorable treatment under the 'aberrant behavior' and 'physical condition' Guidelines provisions. Her 'other circumstances' find their roots in her pronounced – and empathetic – vulnerability.

Her story is not new. It has been fictionalized for centuries, and extant in reality for as long as there have been two genders.

She is a woman of Russian origin who came to the United States late enough in her life that she has had difficulty adapting to the societal *mores* of this Country. Albeit she is graced with decent familial relations, she has been a lonely woman, and seriously cursed with physical troubles. Enter Gilavyan, ten years younger than she is, and perhaps her prayers – at least in part – have been answered. Perhaps she sees him as an exciting, 'dashing' young man who, to her probable astonishment, offers her a love life. He may even harbor real fondness for her. But he has ideas which go far beyond any partiality for her. He sees that illicit money may successfully be made in this

Country. He is intelligent, cunning, and conceptualizes a sophisticated means of doing so. But he needs a partner, someone to whom he can delegate certain elements of his fraudulent scheme. Someone he can trust. Someone who is without the guile to ideate such a scheme, let alone put it into action of her own initiative. Someone who could not possibly equal or replace him in the hierarchy of the scheme. Who better than the woman who is mesmerized by his romantic assurances and apparent affections. So he deliberately uses Ms. Vlasova as a pawn, as really only a cog in his machinery of dishonesty. He knows she will not deny him, he knows that she is bade by love, not by a theft-driven personality characteristic. Even when the 'smoke cleared,' and the scheme exposed, she still professed her attachment to him.

In short, he used her, manipulated her shamelessly. He intentionally put the woman whose affections he claimed in the line of fire. He subjected her to conduct which has now placed her at the gates of prison.

Ms. Vlasova is a non-violent woman who has never been involved with drugs, weapons or physical harm to a fellow human being. She is quite incapable of inventing such unlawful methodology as is the subject of the present Indictment.

She recognizes and acknowledges the comparative gravity of his offense, and accepts the fact that she will necessarily suffer a penalty for her conduct, that she may have to endure a period of incarceration. Even so, she urges this Court to downward depart for the reasons assigned herein. Since the Guidelines are simply 'advisory,' no longer mandatory, this Court has the authority to do so upon good reason. Ms. Vlasova believes she has presented this Court with good reason.

This woman presents a compelling case for comparatively lenient treatment by this Court.

One supposes that the concept of mercy in the sentencing process has gathered so much dust over time that it is all but ignored by the Guidelines-driven sentencing process. The Guidelines are extraordinarily – and notoriously – parsimonious in such regard. But as *Ecclesiastes* might tell us, there is a time to be merciful. This is such a time.

/s/ROGER WITKIN
ROGER WITKIN
BBO #531780
6 Beacon Street, Suite 1010
Boston, Massachusetts  02108
(617) 523-0027 (tel.)
(617  523-2024 (fax)

DATED:    April 9, 2007

# EXHIBIT "A"



**Beth Israel Deaconess Medical Center**

*Harvard Medical Faculty Physicians*
*Department of Orthopaedic Surgery*

A major teaching
hospital of Harvard
Medical School

Mark C. Gebhardt, M.D.
*Chairman, Orthopaedic Surgery*
*Orthopaedic Surgeon-in-Chief*
*Orthopaedic Oncology*

Megan E. Anderson, M.D.
*Orthopaedic Oncology*
*General Orthopaedics*

Douglas K. Ayres, M.D.
*Joint Reconstruction*
*Joint Replacement*

Deborah A. Brown, APRN, BC
*Musculoskeletal Medicine*

Charles S. Day, M.D.
*Chief, Hand & Upper Extremity*

Robert G. Davis, M.D.
*Sports Medicine*
*General Orthopaedics*

John P. Donohue, M.D.
*Musculoskeletal Medicine*
*Rheumatology*

Naven Duggal, M.D., FRCSC
*Foot and Ankle*

Sharon Gates, MSN, RNCS
*Musculoskeletal Medicine*

Michael O'Brien, M.D.
*Musculoskeletal Medicine*
*Sports Medicine*

Arun J. Ramappa, M.D.
*Sports Medicine*

Donald T. Reilly, M.D.
*Joint Replacement*
*Joint Reconstruction*

Edward Rodriguez, M.D., Ph.D.
*Chief, Orthopaedic Trauma*

Tamara D. Rozental, M.D.
*Hand and Upper Extremity*

Edward Vresilovic, M.D., Ph.D.
*Adult Spine Surgery*

Harris S. Yett, M.D.
*Joint Replacement*
*Joint Reconstruction*

August 16, 2006

To Whom This May Concern:

RE: Irina Vlasova    BID#: 127-25-74

I am currently treating Ms. Vlasova for Rheumatoid Arthritis. She was first diagnosed with this condition in 1988. She has severe joint pain and swelling requiring the use of several powerful medications. These medications are important in preventing progression of her disease which could ultimately lead to disability if left untreated. We have tried multiple medications over the last several years. Unfortunately, she continues to have signs of active arthritis. As our options for treatment are limited, Ms. Vlasova has agreed to participate in a clinical trial of a medication being studied for the treatment of Rheumatoid Arthritis. The study medication can increase the risk of serious infection and will require close monitoring. Monitoring will need to be carried out for an indefinite period of time.

Sincerely,

John P. Donohue, MD

[SOURCE: OMR]

330 Brookline Ave.
East Campus, CC2
Boston, MA 02215

Tel (617) 667-3940
Fax (617) 667-2155
www.bidmc.harvard.edu

# EXHIBIT "B"

## Beth Israel Deaconess Medical Center

*Harvard Medical Faculty Physicians*
*Department of Orthopaedic Surgery*

A major teaching hospital of Harvard Medical School

**Mark C. Gebhardt, M.D.**
*Chairman, Orthopaedic Surgery*
*Orthopaedic Surgeon-in-Chief*
*Orthopaedic Oncology*

**Megan E. Anderson, M.D.**
*Orthopaedic Oncology*
*General Orthopaedics*

**Paul T. Appleton, M.D.**
*Orthopaedic Trauma*

**Douglas K. Ayres, M.D.**
*Joint Reconstruction*
*Joint Replacement*

**Deborah A. Brown, APRN, BC**
*Musculoskeletal Medicine*

**Charles S. Day, M.D.**
*Chief, Hand & Upper Extremity*

**Robert G. Davis, M.D.**
*Sports Medicine*
*General Orthopaedics*

**John P. Donohue, M.D.**
*Musculoskeletal Medicine*
*Rheumatology*

**Naven Duggal, MD., FRCSC**
*Foot and Ankle*
*Orthopaedic Trauma*

**Sharon Gates, MSN, RNCS**
*Musculoskeletal Medicine*

**Michael O'Brien, M.D.**
*Musculoskeletal Medicine*
*Sports Medicine*

**Arun J. Ramappa, M.D.**
*Sports Medicine*

**Donald T. Reilly, M.D.**
*Joint Replacement*
*Joint Reconstruction*

**Edward Rodriguez, M.D., Ph.D.**
*Chief, Orthopaedic Trauma*

**Tamara D. Rozental, M.D.**
*Hand and Upper Extremity*

**Edward Vresilovic, M.D., Ph.D.**
*Adult Spine Surgery*

**Harris S. Yett, M.D.**
*Joint Replacement*
*Joint Reconstruction*

November 29, 2006

To Whom This May Concern:

RE: Irina Vlasova   BID#: 127-25-74

I am currently treating Ms. Vlasova for Rheumatoid Arthritis. She was first diagnosed with this condition in 1988. She has severe joint pain and swelling requiring the use of several powerful medications. These medications are important in preventing progression of her disease which could ultimately lead to disability if left untreated. We have tried multiple medications over the last several years. Unfortunately, she continues to have signs of active arthritis. As our options for treatment are limited, Ms. Vlasova agreed to participate in a clinical trial of a medication being studied for the treatment of Rheumatoid Arthritis and has begun treatment. We are currently monitoring her response. She is feeling about the same and somewhat anxious. We will continue to follow her closely.

Sincerely,

John P. Donohue, MD

[SOURCE: OMR]

330 Brookline Ave.
East Campus, CC2
Boston, MA 02215

Tel (617) 667-3940
Fax (617) 667-2155
www.bidmc.harvard.edu

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES

V.                                  INDICTMENT NO. 05-10181-NG

IRINA VLASOVA

CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the within document was served upon AUSA Adam J. Bookbinder, United States Attorneys Office, 1 Courthouse Way, Suite 9200, Boston, MA; U.S.P.O. Jennifer D. Sinclair, United States Department of Probation, 1 Courthouse Way, Suite 1200, Boston, MA 02210 and Ronald Chisholm, Esq., 19 Olde Village DriveWinchester, MA 01890, by mail and by electronic filing, which was e-filed this day.

/s/ Roger Witkin
Roger Witkin
6 Beacon Street, Suite 1010
Boston, MA 02108
Tel. 617 523 0027
Fax 617 523 2024
BBO No. 531780

DATE:    April 9, 2006

14